FILED
01/13/2021
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 21, 2020 Session

## FATMA ADEL SEKIK v. NEHAD ABDELNABI ET AL.

Appeal from the Circuit Court for Knox County
No. 126002   Gregory S. McMillan, Judge
_____

No. E2019-01302-COA-R3-CV
_____

In this divorce appeal, Husband challenges the court's failure to grant a continuance, the child support and alimony obligation imposed, and certain provisions of the parenting plan prohibiting contact with his children and revoking the parental rights set forth in Tennessee Code Annotated section 36-6-101(a)(3)(B). This proceeding also involved allegations of a conspiracy to defraud Wife of funds resulting from a sale of marital property in Gaza during the pendency of the divorce by Husband, his brother, and his brother's wife; those non-spousal parties challenge the court's jurisdiction over them and over the property in Gaza, as well as the court's valuation of that property. They also challenge the court's rulings that they engaged in a civil conspiracy and whether the judgment imposed against them is supported by the pleadings and the evidence. Upon our review of the issues raised, we discern no reversible error in the rulings of the court and accordingly affirm it in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, P.J. W.S., delivered the opinion of the court, in which ARNOLD B. GOLDIN and CARMA DENNIS MCGEE, JJ., joined.

Matthew D. Barocas, Knoxville, Tennessee, for the appellants, Nahed Abdulnabi and Rewa Gharbawe.

Nehad Abdelnabi, Only, Tennessee, Pro Se.

Wanda G. Sobieski, Diane M. Messer, Caitlin Elledge, Zachary T. Powers, and Laura E. Wyrick, Knoxville, Tennessee, for the appellee, Fatma Adel Sekik.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

This appeal arises out of a divorce proceeding. Fatma Adel Sekik ("Wife" or "Mother") and Nehad Abdelnabi ("Husband" or "Father") are from the Middle East; Wife is from Cairo, Egypt, and Husband is from Palestine. The parties were married in 1996 in Egypt and moved to the United States shortly thereafter, where they resided in Knoxville, Tennessee. The parties have four children. Their third child, Hamza, was born in 2002 and has special needs. Husband is an "electronics technician" and owned an electronics business in Knoxville. He also oversaw the financial aspects of family life, including the buying and selling of real property during the marriage, such as the real property located in the Gaza Strip that is the subject of many issues raised in this appeal. Wife primarily took care of the parties' home and four children. Wife also works part-time from home, translating Arabic conversations by phone, for which she is paid by the minute.

Their home was not entirely a happy one, as Wife and her two daughters testified about the emotional and physical abuse Husband inflicted on the family members. The breakdown of the marital relationship accelerated in February 2012, when Husband kidnapped and assaulted a man named Naser Ferwanah, with whom he believed Wife was having an affair. He was indicted for these offenses on September 18, 2012, and in 2016, he was tried, convicted, and sentenced to 17 years in the Tennessee Department of Correction for the felony offenses of aggravated kidnapping, especially aggravated kidnapping, and two counts of aggravated assault.[1]

Wife filed a complaint for divorce on September 7, 2012, on the basis of irreconcilable differences and Husband's inappropriate marital conduct. She sought to be named primary residential parent of the parties' children and sought "reasonable spousal support," both during the pendency of the divorce and after entry of the decree. The complaint contained the automatic mandatory injunctions set forth at Tennessee Code

---

[1] The judgments of conviction entered into the record in this divorce proceeding reflect that Husband was convicted by a jury on January 28, 2016 of the following crimes: aggravated kidnapping, a B felony, for which he was sentenced in May 2016 to twelve years in the Tennessee Department of Correction; especially aggravated kidnapping, an A felony, for which he was sentenced to seventeen years; aggravated assault, a C felony, to which he was sentenced to six years, to run concurrently with his seventeen year sentence; and another count of aggravated assault, a C felony, to which he was sentenced to six years. Husband appealed his convictions, which were affirmed by the Court of Criminal Appeals on direct appeal; that Court observed that "[t]he trial court merged the Defendant's conviction in count one into count two and merged count four into count three and ordered that he serve the sentences concurrently, for a total effective sentence of seventeen years in the Tennessee Department of Correction (TDOC) at 100% release eligibility." *State v. Abdelnabi*, No. E2017-00237-CCA-R3-CD, 2018 WL 3148003, at *1 (Tenn. Crim. App. June 26, 2018), *appeal denied* (Nov. 15, 2018).

Annotated section 36-4-106(d).[2] On September 8, a temporary parenting plan was entered, granting Husband weekend visitation every week, setting his child support obligation at $2,000 per month, and requiring him to pay the premiums of health, dental, and life insurance policies for Wife and the children, as well as "for all Hamza's medical, dental, visual [expenses] and all Hamza's therapy[.]"

On September 27, 2012, Wife filed a Notice of Filing of Related Order to which she attached an order of protection that had been entered by agreement of Husband and Wife in Knox County Circuit Court case number 126003. In that order, Husband agreed to not come about Wife or contact her, directly or indirectly. He also agreed to pay for the household expenses, including the mortgage, utilities, phone and internet, credit cards, health insurance, medical bills, automobile insurance, and others, as well as $2,000 per month in child support. Husband and Wife subsequently reconciled, and by an agreed Amended Order of Protection entered December 5, 2012, they were permitted to have contact. All other terms of the prior agreed order of protection pertaining to Husband's payments of household expenses and child support remained in effect.

In September 2016, Wife moved for a default judgment due to Husband's failure to answer the complaint for divorce. In that motion, she alleged that Husband's "refusal to respond or cooperate with the process has left [Wife] and the parties' four (4) children in desperate financial straits unable to make the arrangements necessary to keep their home or property." She also alleged that Husband "has sent the largest share of the parties' financial resources to the Gaza Strip where it is essentially beyond the reach of his wife and children for their support" and sought a default judgment "so that she can begin the process of making arrangements with the bank to possibly save the home from foreclosure for the children and herself."

Husband responded by filing an answer as well as a Response to the motion for default judgment on October 6; in his response, Husband asserted:

> The default judgment sought, in which Mr. Abdelnabi is deprived of all of his constitutional parental rights while being ordered to pay the extravagant sum of $3,200.00 per month in child support for life—unsupported by the Child Support Guidelines—and in which Plaintiff is awarded all of the marital estate and potential personal property, including unidentified, unspecified, and likely fictional property in the Gaza Strip, is unreasonable,

---

[2] Tennessee Code Annotated section 36-4-106(d) provides that certain temporary injunctions are in effect upon the filing of a petition for divorce and service (or waiver and acceptance of service) of the petition. In pertinent part to the issues raised in this appeal, the complaint stated: "The parties are restrained and enjoined from transferring, assigning, borrowing against, concealing, or in any way dissipating or disposing, without the consent of the other party or an order of the court, of any marital property." This language tracks that of section 36-4-106(d)(1)(A).

inequitable, and unjust under the circumstances and should not be awarded to Plaintiff.

In his answer, Husband admitted that irreconcilable differences had arisen between the parties but denied that he was guilty of inappropriate marital conduct. He also admitted that Wife was a fit and proper person to be primary residential parent of the parties' minor children but averred "that he is also a fit and proper person to be the primary residential parent for the parties' minor children upon his release from incarceration."

On December 8, 2016, Wife filed a Motion for Interim Relief in which she alleged details of Husband's abusive and controlling behavior, reiterated her belief that he had "sent the largest share of the parties' financial resources to the Gaza Strip where it is essentially beyond the reach of his wife and children for their support," and that she feared Husband's brother, who had "recently gone to the Gaza Strip," "may be carrying with him a Power of Attorney to transfer the Gaza Strip property out of [Husband] and into his family over there." On that basis, she asked the court to divest Husband of all real property he held in the United States and in the Gaza Strip and vest it in her "so that she may try to find a way to use it to support the children." She also requested that the court grant her a divorce "now" and reserve any other issues.

The trial court held a hearing and granted Wife's motion for relief by order entered March 20, 2017, in which it, *inter alia*, "ordered and empowered [Wife] to investigate all monies and properties in Defendant's name or in which Defendant may have or has had an interest, wherever located, including, but not limited to, the Gaza Strip" as well as all debts, claims, liens, and contracts relating to those properties. The trial court also ordered Husband to instruct all persons receiving funds "from any property in which he has or had an interest (including, but not limited to the Gaza Strip properties) to pay only the reasonable and necessary expenses related to the property and forward to [Wife] all net revenues for the next sixty (60) days (starting February 22, 2017)." After that time, Wife was "empowered to take control of all properties to which [Husband] holds title or in which [he] has or has had an interest." The order also provided that "[a]ll income related to the properties, including, but not limited to, the properties in the Gaza Strip, shall be paid to or retained by [Wife] to be used for the reasonable support of the family and the marital estate and for which [Wife] shall account to this Court." She was also ordered to "collect, marshal, and take custody, control and possession of all funds, accounts, mail, and other assets of [Husband], or under the possession or control of [Husband] or assets traceable to assets owned or controlled by [him] wherever situated (except as set forth in Paragraph 4 regarding the sixty (60) day period for transfer of control in the Gaza Strip)" but that she was not to "alienate, transfer, sell or dispose of such property without court approval." The trial court also ordered Husband to "execute any document, release, power of attorney or other required authorization to allow [Wife] to investigate the real property."

Wife attempted to comply with the court's order but filed a Motion for Emergency

Relief on June 13, 2017, in which she alleged that Husband and his counsel had not responded to her requests to execute the power of attorney and release documents she needed in order to investigate Husband's real property holdings. She also alleged that she had sent the court's order to be "entered by the Palestinian Embassy and forwarded to Gaza." In her motion, she alleged that Husband's brother "is attempting the sale [of] 1 1/2 dunom (approximately 1 1/2 acre) of the subject property and has reportedly shown multiple people that he has a General Power of Attorney from Defendant which allows the sale and was signed by Defendant May 18 or 19, 2017," and that she "fears that Defendant's brother may succeed in transferring the property before she can get the Order enforced."

The trial court held a hearing on Wife's motion for emergency relief and entered an order on June 30 "for the purpose of maintaining the status quo so far as possible as it relates to the parties' marital property until final disposition can occur, based on the allegations in [Wife]'s Motion for Emergency Relief because of immediate risk of irreparable harm to the marital estate." The order required Husband "to execute a Quitclaim Deed (or other such document as may be required in Gaza to transfer title) to the property or properties previously referred to by the parties and the court as the 'chalet property' and the adjoining tract(s) of land in which [Husband] has or has had an interest to [Wife]," who would have no power to transfer or sell the property or to grant a power of attorney to others, without further order of the court.

In July 2017, Wife sought to amend her complaint pursuant to Rules 15.01, 19 and 20 of the Tennessee Rules of Civil Procedure, to include additional grounds and to add two parties, Husband's brother, Nahed Abdulnabi ("Brother") and sister-in-law, Rewa Gharbawe ("Sister-in-Law"), as defendants. In the proposed amended complaint, Wife alleged that Husband "has knowingly worked with his brother, Nahed Abdulnabi . . . and sister-in-law, Rewa Gharbawe, to control the marital funds and to deprive [Wife] and the children of the funds and property" and that they "have conspired to defeat the orders of this Court and the rights of [Husband]'s wife and children." The court held a hearing on August 11, and over Husband's objection, granted Wife's motion to amend the complaint; an order was subsequently entered memorializing the oral ruling and holding that joinder was appropriate "pursuant to Rules 19 and 20" of the Tennessee Rules of Civil Procedure because "Plaintiff cannot obtain complete relief without the two additional Defendants and because the conspiracy alleged presents common fact questions and questions of law." The amended complaint was filed on August 15, 2017. Wife mailed copies of the Amended Complaint to Brother and Sister-in-Law at their Georgia address and also attempted to serve the complaint through the Tennessee Secretary of State as well as by personal service.

In April 2018, Wife sought a default judgment against Brother and Sister-in-Law for their failure to file an answer and sought a judgment "in the amount of cash they received from the illicit sale of a portion of the property in Gaza (Four Hundred Fifty Thousand Dollars ($450,000.00), and for any and all rents and receipts received from the

maintenance and operation of Gaza property after February 22, 2017."[3] After a hearing at which both Brother and Sister-in-Law appeared and testified, the trial court stated on the record that Sister-in-Law attempted to evade service and orally granted a default judgment against her; an order memorializing the default judgment against Sister-in-Law was subsequently entered on August 7, 2018.

Brother had been served with the amended complaint while at the courthouse for the hearing during which the default judgment was entered against his wife. Despite the default judgment, Sister-in-Law joined in Brother's answer, filed on June 11, 2018, in which they denied that they engaged in a civil conspiracy against Wife. In their answer, they admitted that "[Husband] has executed a power of attorney for [Brother] related to property in the Gaza Strip." They also asserted a counter/cross-claim against Husband and Wife for Husband's fraud, misrepresentation, constructive fraud, and unjust enrichment stemming from their business dealings "prior to the year 2000," various real estate transfers, and expenses and losses incurred while acting as Husband's agent in Gaza. Brother and Sister-in-Law sought "actual, compensatory, incidental damages, consequential damages, and/or punitive damages" from Husband and Wife. Wife duly filed an answer to the counter complaint raised against her; though Brother and Sister-in-Law filed a motion for default judgment against Husband, the record does not contain an answer to the cross-claims raised against him.

Wife filed a motion to bifurcate the issues of the grounds for the divorce from the remaining issues in the divorce; after a hearing, the trial court entered an order on January 31, 2019, awarding Wife a divorce on the basis of Husband's inappropriate marital conduct "in the form of physical and emotional abuse" and his felony conviction, for which he had been sentenced to serve seventeen years in the penitentiary.

On February 6, 2019, Husband's counsel filed a motion to be relieved as counsel on the basis that Husband had filed a Petition for Post-Conviction Relief alleging ineffective assistance of counsel, and thus he could no longer effectively represent Husband in the divorce proceedings. The court granted the motion on February 8 permitting Husband's counsel to withdraw and ordered that "[t]his matter continues to be set for trial on February 25–27, 2019, and March 4, 2019"; that "[t]he relieving of Mr. Jolley as counsel will not continue this trial date"; and that Husband "shall obtain new counsel or represent himself."

Meanwhile, Brother and Sister-in-Law fired their attorney and hired another one, who filed a motion to continue the trial "until such time as the undersigned has adequate time to prepare the defense of his client"; that motion was denied. They also filed another

---

[3] February 22, 2017 was the date imposed by the trial court's March 20 order that required Husband to instruct all persons receiving funds "from any property in which he has or had an interest (including, but not limited to the Gaza Strip properties) to pay only the reasonable and necessary expenses related to the property and forward to [Wife] all net revenues for the next sixty (60) days (starting February 22, 2017)."

motion seeking the trial court's permission to appeal the court's "subject matter jurisdiction over the plaintiff's claims."[4] No order was entered on the motion for interlocutory appeal, and Brother and Sister-in-Law did not seek permission in this Court to pursue an extraordinary appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure.

A trial on the remaining issues, namely child support, the division of the marital property, alimony, and Brother's cross/counter-claims, was held on February 25, 26, and 27, 2019. During the trial, Wife, the parties' two daughters, Sister-in-Law, Husband, and Brother testified.

By order entered June 25, 2019 ("the June 25 order"), the trial court dismissed Brother's claims as being "without merit and not supported by any competent evidence." The trial court also made an adverse credibility finding: "Brother, [Husband], and [Sister-in-Law] have no credibility given their actions and testimony during this pendency of this case."

The trial court set Husband's child support obligation at $1,000 per month for the two children who were still under the age of majority and continued child support indefinitely for the couple's youngest child, who is disabled, at a rate of $500 per month. The court also awarded Wife a $76,500.00 judgment for child support arrearages since February 2016, when the couple stopped living together due to Husband's incarceration. The order stated that the Court adopted the residential, co-parenting, and decision making

---

[4] The court, in a hearing on Brother and Sister-in-Law's motion to continue on February 19, had stated:

> THE COURT: Okay. I realize that I can't order land sold or do stuff with it that I could if it were in Tennessee, but I absolutely have personal jurisdiction over people here, and have exercised long-arm and subject-matter jurisdiction over your clients without any objection in nearly a year and a half. That would tell me I'm capable of telling them that they need to do the following with the property or the proceeds or whatever else.
> So I'm not sure that there is a subject-matter jurisdiction issue with regard to the land itself when I have jurisdiction over the people.

The substance of Brother and Sister-in-Law's argument in the motion requesting the trial court's permission to seek interlocutory appeal was:

> The property in question is real property wholly located in "Gaza". . . . This Honorable Court would have no power to force the nullification of a conveyance which occurred in a location/territory that has no duty or willingness to give full faith and credit to the judgment(s) of this Honorable Court. Further, and subject to further proof in this action, your movant assumes that this Court would lack both personal and subject matter jurisdiction over the transferees of said property, should it be shown that the purchasers of said property were natives of Gaza or some other foreign land. As such, this Court lacks subject matter jurisdiction over this action for the purpose of the remedies sought by the Plaintiff[.]

provisions of Wife's proposed plan and that Wife's counsel was to submit a parenting plan, containing Wife's proposed provisions and the Court's child support rulings, to the Court for entry.

The court also found that Wife was a candidate for alimony *in futuro*, given her need of $3,000.00 per month, lack of education and earning ability, and inability to work full time given her status as the sole caretaker for the parties' severely disabled son, rendering her "not capable of pursuing the education and training necessary to use her foreign degree in education." However, given Husband's incarceration, the court found that he "has no ability to pay alimony at this time" and ordered alimony *in futuro* in the amount of $100.00 per month until he is released from incarceration and a determination could be made as to the parties' circumstances. The court also awarded Wife her attorney's fees incurred prior to trial, in the amount of $94,724.00. Wife was awarded a judgment of $131,472.00 for *pendente lite* expenses that Husband failed to pay.

The trial court adopted Wife's valuations of the various marital assets and divided the marital assets and debts. Exhibit 1 to the final divorce contains the court's assigned values and division of the marital assets and debts, which reflect that Husband received assets and debts amounting to a net total of $1,012,012.00 and Wife receiving $891,236.75. The trial court also found that Husband had dissipated the marital estate during the pendency of the divorce "through the sale of four apartments in Gaza," by paying $45,000 to purchase a car wash, and by not accounting "for $46,000 that is missing from funds related to Brother's sale of various pieces of Gaza property." With respect to the conspiracy to dispose of marital property in Gaza by Husband, Brother, and Sister-in-Law, the court set forth in great specificity the property transfers and communications that took place and held:

> 7. Between the time of [Husband]'s arrest in February 2012 and his conviction in 2016, he engaged in a series of actions the Court finds are designed to prevent [Wife] from sharing in the marital estate and prevent this Court from exercising jurisdiction over it. . . .
>
> * * *
>
> [Husband], Brother, and [Sister-in-Law] jointly conspired to violate this Court's orders, dispose of marital property in such a fashion as to defeat [Wife]'s rightful claim to an equitable division of the marital estate.

The judgment ultimately awarded to Wife reads:

> 10. Father, Brother and [Sister-in-Law] are hereby ordered to place for sale all of the Gaza property remaining titled in Father's name. The parties shall

- 8 -

use their best efforts to accomplish a commercially reasonable sale for a fair market price given the values the parties testified to in open court and the Court's valuation found herein. In addition, they are ordered to place for sale the two pieces of property held in Brother's name. From the proceeds of the sale, Mother shall be paid the sum of $690,357.00 (See Exhibit 1 Line 8). From Father's portion of the proceeds, Mother shall be paid an additional $529,475.47 for the judgments awarded to her herein against Father, Brother, and [Sister-in-Law] jointly and severally. The judgment includes $76,500.00 for child support arrearages, $131,472.00 for pendente lite support arrearages, $110,443.37 for one-half of the amount due for the sale of 1,250 square meters of Gaza property, $116,336.00 for one-half of the 590 square meters of property Brother transferred to himself, and $94,724.00 for Wife's pre-trial attorney's fees. In the event that the sale does not suffice to pay the full amount awarded to Mother herein, the funds shall first be applied to Father's outstanding obligations to Mother and then to the joint and several judgements against Father and his coconspirators. Any unpaid amount shall remain a judgment and earn interest at the maximum statutory rate for judgments commencing upon this Order becoming final.

Husband filed a motion for a new trial, asserting, *inter alia*, that the court abused its discretion by denying a "request for a continuance to allow him sufficient time in which to locate counsel to represent him." Husband also asserted that the court "judicially interfered with the prenuptial agreement and erred in refusing to allow or even consider the prenuptial agreement to be entered into the record by the defendant." He also contended that the court "erred in assessing an excessive amount of child support and alimony in light of the prenuptial agreement that the defendant was prevented from entering into evidence." No exhibits, affidavits, or other materials were attached to the motion. The trial court construed the motion as one to alter or amend the judgment and denied it.

Meanwhile, Brother and Sister-in-Law had filed their notice of appeal. After entry of the court's order denying Husband's motion for a new trial, Husband also appealed.

On October 10, 2019, the court entered a permanent parenting plan naming Wife as primary residential parent and awarding Husband zero days of parenting time. The plan contained the following "special provisions" in section J:

> There shall be no physical contact with the children due to [Husband]'s convictions for violent felonies and seventeen (17) year sentence, no visits at prison, no Facetime or its equivalent. [Husband] is hereby restrained and enjoined from giving personal information about his children to other prisoners and/or encouraging other inmates to contact the children now or upon release.

The order set Husband's gross monthly income at $3,336.00 and Wife's at $864.00. Husband's child support order was set at $1,000 per month, which was to "change to $500.00 per month when Omar ages out or graduates from high school, whichever is last." With respect to the parties' other child, the order provided that a "500.00 child support [obligation] shall continue indefinitely because of Hamza's special needs. This will be needed for Hamza's lifetime, and shall be modifiable." The order also struck through the boilerplate list of parents' rights, as set forth at Tennessee Code Annotated section 36-6-101, "[i]n light of Father's history of violent felonies."

With the entry of the parenting plan, this Court, by order entered October 22, 2019, deemed the premature notices of appeal filed by Brother and Sister-in-Law and Husband to be filed after entry of the parenting plan, which represented the final judgment.

### ISSUES PRESENTED

This divorce appeal is unusual in that no party is challenging the court's classification or division of marital assets or the designation of primary residential parent. Instead, Brother and Sister-in-Law challenge the court's jurisdiction to adjudicate the conspiracy to defraud claim levied against them and the judgment it ultimately entered by raising the following issues:

1. Whether the trial court erred in asserting in rem subject matter jurisdiction over real property located in the Gaza Strip and assuming supplemental and/or pendent jurisdiction over non-spousal parties in a divorce case.
2. Whether the trial court erred in imposing liability for damages against nonspousal parties for civil conspiracy to dissipate marital assets in a divorce case.[5]
3. Whether the trial court erred in assigning $1,380,714.00 as the value of marital property located in the Gaza Strip without competent and reliable testimony, and without explanation.
4. Whether the trial court erred as a matter of law in finding that Defendants Nahed Abdulnabi and Rewa Gharbawe engaged in a civil conspiracy with Nehad Abdelnabi (Husband) to dissipate marital assets.
5. Whether dissipation of marital assets sufficiently constitutes a predicate tort necessary for a plaintiff to sustain a claim for civil conspiracy where no predicate tort and requisite culpable mental state is pled or established by the evidence at trial.
6. Whether the Court erred in awarding judgment for relief which was not

---

[5] This issue is not addressed in the argument section of their brief, which normally would constitute a waiver of the issue. *Bean v. Bean*, 40 S.W.3d 52, 56 (Tenn. Ct. App. 2000). However, their arguments pertaining to Issues 4, 5, and 6 appear to also address this issue, and thus we will effectively resolve Issue 2 in our treatment of those issues in sections C and E, *infra*.

requested in the Complaint and all subsequent iterations of same.

7. Whether the total amount of damages awarded to the plaintiff was contrary to the law and evidence and unjustifiably excessive, and whether the trial court erred because it did not articulate the legal and factual basis supporting its decision.

We note that a default judgment was entered against Sister-in-Law, which has not been appealed. "A judgment for default impliedly constitutes an admission of all the properly pleaded material allegations of fact contained in the complaint, except the plaintiff's unliquidated damages." *Discover Bank v. Morgan*, 363 S.W.3d 479, 495 (Tenn. 2012) (citing *Patterson v. Rockwell Int'l,* 665 S.W.2d 96, 101 (Tenn. 1984); *State ex rel. Jones v. Looper,* 86 S.W.3d 189, 194 (Tenn. Ct. App. 2000)). Accordingly, Sister-in-Law has no basis for raising Issues 2, 3, 4, and 5. However, given that Brother did not have a default judgment entered against him, we will still consider all of the issues raised by these parties.

Husband also appeals, raising the following issues for our review:

1. [Whether t]he trial court erred in denying the Defendant's request for a continuance to allow new counsel time to prepare for trial;
2. [Whether t]he trial court erred in assessing an excessive amount of child support and alimony; and,
3. [Whether t]he trial court erred in adopting the Plaintiff's proposed parenting plan over the Defendant's objection.

Husband has been a zealous advocate for himself on appeal and has filed numerous motions, none of which directly bear on the resolution of the issues raised in this appeal. One remains pending, which we have addressed in a separate order, denying the sanctions he seeks.

**STANDARD OF REVIEW**

This case was tried by the trial court sitting without a jury. Accordingly, we review the case de novo upon the record with a presumption of correctness regarding the trial court's findings of fact and will affirm the trial court's findings unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Cannon v. Loudon Cty.*, 199 S.W.3d 239, 241 (Tenn. Ct. App. 2005) (citing *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993)). In order for the evidence to preponderate against a particular finding of fact, it must support another finding of fact with greater convincing effect. *Ingram v. Wasson*, 379 S.W.3d 227, 237 (Tenn. Ct. App. 2011) (citation omitted). "[W]hen the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues." *Riggs v. Riggs*,

- 11 -

250 S.W.3d 453, 456 (Tenn. Ct. App. 2007) (citing **McCaleb v. Saturn Corp.,** 910 S.W.2d 412, 415 (Tenn. Workers Comp. Panel, 1995); **Whitaker v. Whitaker,** 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). As such, we give great weight to the credibility accorded to a witness by the trial court. **Id.** (citations omitted). No presumption of correctness, however, attaches to the trial court's conclusions of law and our review is de novo. **Bowden v. Ward,** 27 S.W.3d 913, 916 (Tenn. 2000).

### ANALYSIS

### A. Subject Matter Jurisdiction

Brother and Sister-in-Law argue that "[t]he Tennessee Constitution, the General Assembly, or the common law have not conferred on divorce courts the power to adjudicate cases of this nature, [t]o wit, cases seeking to set aside real property transactions in the Gaza Strip, a foreign land under terrorist control." Thus, they argue, "the trial court lacked in rem subject matter jurisdiction over real property located wholly within the Gaza Strip."

In Tennessee, circuit courts have concurrent jurisdiction with the chancery courts to grant divorces. Tenn. Code Ann. § 16-10-108. By virtue of Tennessee Code Annotated section 36-4-121, a court trying a divorce case is empowered to "equitably divide, distribute or assign the marital property" and "to effectuate its decree by divesting and re-investing title to such and, where deemed necessary, to order a sale of such property and to order the proceeds divided between the parties." **Knobler v. Knobler**, 697 S.W.2d 583, 585 (Tenn. Ct. App. 1985). While "a court of one state is without jurisdiction to pass title to lands lying wholly in another state" and, thus, that "[t]he local court cannot by its decree bind [such] land," it is well-settled that, "in a proper case, with the necessary parties before the court, a decree in personam may be properly passed requiring a party defendant holding the legal title in trust, or otherwise, to transfer such title in accordance with the decree of the court." **Cory v. Olmstead,** 154 Tenn. 513, 290 S.W. 31, 32 (Tenn. 1926).

Brother and Sister-in-Law's brief does not acknowledge the foregoing authority. Instead, they rely on the test set forth in **Staats v. McKinnon**[6] to argue that "[t]he nature or

---

[6] In **Staats**, this Court explained:

> The existence of subject matter jurisdiction depends on the nature of the cause of action and the relief sought. Thus, when a court's subject matter jurisdiction is questioned, it must first ascertain the nature or gravamen of the case. The court must then determine whether the Tennessee Constitution, the General Assembly, or the common law have conferred on it the power to adjudicate cases of that sort. Both determinations present questions of law which this court reviews de novo without a presumption of correctness.

206 S.W.3d 532, 542 (Tenn. Ct. App. 2006) (citations omitted).

gravamen of the instant case against [Brother] and [Sister-in-Law] is [the] supplemental claim for allegedly engaging in a civil conspiracy to dissipate marital assets."

We respectfully disagree. The Amended Complaint first fully incorporated the initial complaint for divorce, and Wife's addition of a conspiracy to defraud claim was an attempt to hold Husband, Brother, and Sister-in-Law liable for transferring marital assets outside the marital estate that was intertwined with the divorce proceedings.[7] We conclude that the gravamen of the complaint is a divorce matter.

As to relief, while Wife requested in the Amended Complaint "[t]hat all transfers of property from [Husband] and/or [Brother] and/or [Sister-in-Law] be declared null and void and the property be disgorged and restored to the marital estate," she alternatively requested "that judgment enter against all the Defendants jointly and severally for all funds received that relate to the property and losses associated with their actions or inactions."

The court's June 25 order does not attempt to set aside the transactions relating to the real property in the Gaza Strip or transfer legal title to the Gaza Strip properties, as

---

[7] In the Amended Complaint, Wife alleged:

8. Original Defendant has knowingly worked with his brother, Nahed Abdulnabi, and sister-in-law, Rewa Gharbawe, to control the martial funds and to deprive Ms. Sekik and the children of the funds and property.

* * *

10. In April 2017, Rewa Gharbawe arranged for Samir Farhat, a Florida notary to notarize an illegal Power of Attorney for Defendants.

11. Original Defendant's brother, Nahed, is, on information and belief, in Gaza at this time attempting to sell the property. Nahed has an executed Power of Attorney (attached hereto as Exhibit B), that appears to have been notarized by a Florida notary on April 24, 2017, some three (3) months after this Court's admonition that the property be held for the benefit of the family pending the final divorce. Nahed has told friends and relatives that he is doing as his brother, Original Defendant, directs.

12. Original Defendant, his brother and sister-in-law have conspired to defeat the orders of this Court and the rights of Original Defendant's wife and children.

13. This Honorable Court has already assumed jurisdiction over Nehad Abdelnabi. Personal jurisdiction is proper over Nahed Abdulnabi and Rewa Gharbawe under the civil conspiracy theory of personal jurisdiction as articulated by the Tennessee Supreme Court and *Chenault v. Walker*, 365 S.W. 3d 45 (Tenn. 2001). The Defendants have jointly and fraudulently acted to attempt to convey the parties' property and to sequester the funds arising therefrom. These acts while the divorce is pending constitute a civil conspiracy as well as contempt of the statutory injunctions and Order of this Court.

- 13 -

Brother and Sister-in-Law argue; rather, it sought to compel Husband, Brother, and Sister-in-Law to convey the land so as to realize Wife's marital share of the assets transferred during the pendency of the divorce by awarding Wife a "judgment, jointly and severally against [Husband], Brother, and [Sister-in-Law] for $116,336.00 for her one-half interest in the property transferred to Brother in violation of this Court's orders" and ordered Husband, Brother, and Sister-in-Law "to place for sale all of the Gaza property remaining titled in [Husband]'s name . . . and the two pieces of property held in Brother's name." From the proceeds of that sale, Wife was to be paid for her share of the real property in Gaza, which no party disputes was a marital asset subject to division.

We conclude that the trial court had jurisdiction over this divorce action and thus properly exercised its jurisdiction to order the land sold and equitably divide and distribute the proceeds from the sale of marital property located in the Gaza Strip.

## B. Jurisdiction over Non-Spousal Parties

Brother and Sister-in-Law argue that the trial court "improperly exercised pendent and supplemental jurisdiction over claims against non-spousal parties in a divorce case."

Brother and Sister-in-Law's articulation of this issue is imprecisely worded and incorrectly refers to a federal court's exercise of jurisdiction over State law claims, which is not applicable in this case. We perceive that they are in fact challenging the court's exercise of personal jurisdiction over them, in light of this further contention in their brief:

> Plaintiff charged non-spousal parties Nahed Abdulnabi and Rewa Gharbawe with conspiracy to dissipate marital assets, which is not authorized by the divorce statutes, the Tennessee Constitution, the General Assembly or the common law. The trial court's permissive joinder of non-spousal parties as additional defendants in a divorce case for allegedly engaging in a civil conspiracy with Husband to dissipate marital assets is plain error and an abuse of discretion. This case must be dismissed on the basis that the trial court lacks subject matter jurisdiction over non-spousal parties in a divorce case.

As a general matter, we perceive no conflict with "the divorce statues, the Tennessee Constitution, or the General Assembly" in the joinder of non-spousal parties who were alleged to be involved in the transfer of marital assets so as to put them outside the marital estate.[8] To the extent Brother and Sister-in-Law intend to argue that the trial court abused

---

[8] For example, in ***Kilgore v. Kilgore***, a husband, with wife's acquiescence, had attempted to convey two parcels of real property to their son to defraud the IRS. No. M2006-00495-COA-R3-CV, 2007 WL 2254568, at *1 (Tenn. Ct. App. Aug. 1, 2007). The Wife filed an answer to the husband's subsequent complaint for divorce and then filed a third-party complaint against their son and another relative to whom he had deeded part of the property that the wife contended was actually part of the marital estate. ***Id.*** This

its discretion in joining them as parties to the lawsuit, their arguments on appeal fail to make an argument demonstrating how the court erred in this regard and have thus waived the issue. *Bean v. Bean*, 40 S.W.3d 52, 56 (Tenn. Ct. App. 2000) (holding that "an issue is waived where it is simply raised without any argument regarding its merits") (citing *Blair v. Badenhope*, 940 S.W.2d 575, 576–577 (Tenn. Ct. App. 1996); *Bank of Crockett v. Cullipher*, 752 S.W.2d 84, 86 (Tenn. Ct. App. 1988))

"[A] decision regarding the exercise of personal jurisdiction over a defendant involves a question of law to which de novo review applies." *Turner v. Turner*, 473 S.W.3d 257, 268 (Tenn. 2015) (quoting *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 645 (Tenn. 2009)) (internal quotation marks omitted). "[P]ersonal jurisdiction recognizes and protects an individual liberty interest that flows from the Due Process Clause and requires that maintenance of the suit "not offend 'traditional notions of fair play and substantial justice.'" *Turner v. Turner*, 473 S.W.3d 257, 270 (Tenn. 2015) (quoting *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, (1982)). "It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Turner*, 473 at 270 (quoting *Ins. Corp. of Ireland*, 456 U.S. at 703). "Because the requirement of personal jurisdiction functions to protect an individual right, it can, like other such rights, be waived." *Id.* Further, a defendant waives his right to contest the court's jurisdiction over him by recognizing "the proper pendency of the cause by making a motion that goes to the merits or by filing an answer, without challenging personal jurisdiction." *First Century Bank v. Duyos*, No. E2019-01441-COA-R3-CV, 2020 WL 3258457, at *3 (Tenn. Ct. App. June 16, 2020) (quoting *Landers v. Jones*, 872 S.W.2d 674, 677 (Tenn. 1994)). "[A] defendant is permitted to raise the defense of lack of personal jurisdiction at the same time other defenses are raised. Waiver occurs only if there is no objection to personal jurisdiction in the first filing, either a Rule 12 motion or an answer." *Landers v. Jones*, 872 S.W.2d 674, 676 (Tenn. 1994).

In order for a state to have personal jurisdiction over a non-resident party, such as Brother and Sister-in-Law, who live in Georgia, the state must achieve service of process and must also have minimum contacts with the individual. *See Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945); *Masada Investment Corp. v. Allen*, 697 S.W.2d 332, 334 (Tenn. 1985). Generally, these contacts must be such that the party "should reasonably anticipate being haled into court" in that state. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Masada*, 697 S.W.2d at 334. The Tennessee Supreme Court has held that Tennessee courts can exercise "conspiracy theory personal jurisdiction" over non-resident

---

Court was not called upon to decide whether the joinder of the third-party defendants was proper but proceeded to adjudicate the issues they and Husband raised on appeal, holding that the transfer of land was void *ab initio* and that the Husband and Wife retained ownership of the parcels, such that they were properly subject to division. *Id.* at *6–7.

- 15 -

defendants when:

> (1) two or more individuals conspire to do something,
> (2) that they could reasonably expect to lead to consequences in a particular forum, if
> (3) one co-conspirator commits overt acts in furtherance of the conspiracy, and
> (4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state,
>
> then those overt acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum.

*Chenault v. Walker*, 36 S.W.3d 45, 53 (Tenn. 2001). The relevant portion of the Tennessee long-arm statute reads:

> (a) Persons who are nonresidents of Tennessee and residents of Tennessee who are outside the state and cannot be personally served with process within the state are subject to the jurisdiction of the courts of this state as to any action or claim for relief arising from:
>
> * * *
>
> (2) Any tortious act or omission within the state;
>
> * * *
>
> (6) Any basis not inconsistent with the constitution of this state or of the United States.

Tenn. Code Ann. § 20-2-214.

In this case, the Amended Complaint alleged that Husband "has both dissipated marital assets and engaged in a civil conspiracy with his brother . . . and sister-in-law . . . with the intent to fraudulently defeat [Wife]'s claim for equitable division and this Court's ability to award such properties to [Wife]." Specifically, the amended complaint alleged that Husband, Brother, and Sister-in-Law "have jointly and fraudulently acted to attempt to convey the parties' property and to sequester the funds arising therefrom[, and t]hese acts while the divorce is pending constitute a civil conspiracy as well as contempt of the statutory injunctions and Order of this Court." Moreover, it is undisputed that not only did Brother and Sister-in-Law appear in court to defend these allegations, they filed a

counter/cross-claim against Husband and Wife, thus availing themselves of the jurisdiction of the court. Most importantly, in answering the amended complaint, they did not raise personal jurisdiction as a defense or otherwise object to the court's exercise of jurisdiction over them. They have thus waived the issue. *Landers*, 872 S.W.2d at 676. We hold that the court properly exercised personal jurisdiction over Brother and Sister-in-Law.

### C. Conspiracy

In the second, fourth, and fifth issues they raise, Brother and Sister-in-Law challenge the court's imposition of liability against them, as "non-spousal parties [to the divorce] for engaging in a civil conspiracy with Husband to dissipate marital assets." They argue that "there is no private cause of action for dissipation of marital assets against non-spousal parties in a divorce case in the State of Tennessee."

At the outset of our consideration of these issues, we must clarify that Wife did not allege that Brother and Sister-in-Law dissipated marital assets but that they conspired to convey marital property and keep the funds resulting from that sale away from Wife. Dissipation of marital assets is to be considered in the context of dividing the marital estate, and no party to this appeal is challenging the court's division.[9] Brother and Sister-in-Law's

---

[9] Tennessee Code Annotated section 36-4-121(c)(5)(B) defines "dissipation of assets" as "wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed." This Court has held that "[d]issipation of marital property occurs when one spouse uses marital property, frivolously and without justification, for a purpose unrelated to the marriage and at a time when the marriage is breaking down." *Altman v. Altman*, 181 S.W.3d 676, 681–82 (Tenn. Ct. App. 2005) (citations omitted). It involves "intentional or purposeful conduct . . . that has the effect of reducing the funds available for equitable distribution." *Id.* at 682. An "allegedly improper or wasteful expenditure or transaction must be considered in the context of the marriage as a whole, and it must be weighed along with all the other relevant factors in the case." *Id.* (citing *Kittredge v. Kittredge*, 803 N.E.2d 306, 316 (Mass. 2004)). In determining whether a transaction amounts to dissipation, the court is to consider the following factors:

> (1) whether the expenditure benefitted the marriage or was made for a purpose entirely unrelated to the marriage; (2) whether the expenditure or transaction occurred when the parties were experiencing marital difficulties or were contemplating divorce; (3) whether the expenditure was excessive or de minimis; and (4) whether the dissipating party intended to hide, deplete, or divert a marital asset.

*Id*. (footnote omitted). In *Melvin v. Johnson-Melvin*, Judge Koch observed in his concurring opinion:

> Parties who dissipate marital assets should not be permitted to benefit from their conduct. However, the remedy for dissipation is not found in adjusting the value of the marital assets but rather in the allocation of the marital estate. Tenn. Code Ann. § 36-4-121(c)(5) specifically instructs courts to consider the dissipation of marital property when dividing marital property. Accordingly, the courts may appropriately reduce the share of the marital estate a party receives if the court finds that the party has dissipated marital assets.

argument is long on the law of dissipation but short on any explanation as to why they believe their actions do not amount to *conspiracy* with Husband to defraud Wife of a portion of the marital estate, which is the allegation that the court found was substantiated by the proof. Nor do they include any citations to the record illustrating any relevant facts that would warrant reversal of the trial court's findings in this regard.

The tort of conspiracy to defraud "is defined as a 'combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means.'" ***Brown v. Birman Managed Care, Inc.***, 42 S.W.3d 62, 67 (Tenn. 2001) (quoting ***Chenault***, 36 S.W.3d 45). In ***Brown***, we further explained:

> Each conspirator must have the intent to accomplish this common purpose, and each must know of the other's intent. ***Dale*** [***v. Thomas H. Temple Co***.], 186 Tenn. [69] at 90, 208 S.W.2d [344] at 353–54 [(Tenn. 1948)]. The agreement "need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy." ***Id.*** Finally, "it is [a] basic principle that each conspirator is responsible for everything done by his confederate which the execution of the common design makes probable as a consequence"; in other words, each conspirator is liable for the damage caused by the other. ***Id.*** 186 Tenn. at 90–91, 208 S.W.2d at 354; *accord* ***Huckeby*** [***v. Spangler***]*,* 521 S.W.2d [568] at 573–74 [(Tenn. 1974)].

***Id.*** This Court has previously explained the concept of conspiracy to defraud in ***Taylor v. George***:

> As defined in ***Dale v. Thomas H. Temple Co.,*** 186 Tenn. 69, 208 S.W.2d 344 (Tenn. 1948), "[a] 'conspiracy to defraud' on the part of two or more persons means a common purpose, supported by a concerted action to defraud, that each has the intent to do it, and that it is common to each of them, and that each has the understanding that the other has that purpose." 208 S.W.2d at 353–354. . . .
>
> As stated in 15A C.J.S. Conspiracy, § 9:
>
> > A mere conspiracy to commit a fraud is never of itself a cause of action; it must be proved that there was a conspiracy to defraud and a participation in the fraudulent purpose, either in

---

2006 WL 1132042, at *10 (Koch, P.J., concurring).

the scheme or in its execution, which worked injury as a proximate consequence. It is the civil wrong resulting in damage and not the conspiracy which constitutes the cause of action for conspiracy to defraud.

*Pusser v. Gordon*, 684 S.W.2d 639, 642 (Tenn. Ct. App. 1984); *see also* **Brown v. Birman Managed Care, Inc.***,* 42 S.W.3d 62, 67 (Tenn. 2001) (recognizing that a conspiracy to defraud claim requires underlying demonstration of fraud); **Stanfill v. Hardney***,* No. M2004-02768-COA-R3-CV, 2007 WL 2827498 at *7 (Tenn. Ct. App. Sept. 27, 2007) (holding that a conspiracy claim requires showing of commission of tortious or wrongful act).

No. E2014-00608-COA-R3-CV, 2015 WL 1218658, at *7 (Tenn. Ct. App. Mar. 16, 2015). Fraud itself is not specifically defined, and this Court has observed that "fraud remains a generic term broad enough to encompass 'all acts, omissions, or concealments which involve a breach of legal and equitable duty, trust or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another.'" **Keith v. Murfreesboro Livestock Mkt., Inc.**, 780 S.W.2d 751, 754 (Tenn. Ct. App. 1989) (quoting **Smith v. Harrison**, 49 Tenn. 230, 243–44 (Tenn. 1870)). Intention to defraud is itself a question of fact. **Id.**

We turn to a review of the pertinent evidence in the record. Husband testified that he owned property in Gaza, some of which had been sold in June 2017, while he was in prison, by "ma[king] a power of attorney to [his] brother."  He explained that process, which he testified he knew was against the court's order enjoining him from disposing of marital assets, as follows:

Q. How did you make a power of attorney?
A. Well, by contracting -- by asking my sister to help me find somebody where -- in working at the Palestinian embassy to try to make a power of attorney and send it to my brother.
Q. Okay. You did that from prison?
A. I called my sister and asked her to help me out -- yes. I called her from prison, yes. Correct, sir.

* * *

Q. Is this the power of attorney that you issued?
A. This is a translation of it.
Q. Translation. Okay.
A. Yeah.
Q. This is also part of Exhibit 20. Do you recognize this?

- 19 -

A. Yes.
Q. And what is it?
A. This is the power of attorney.

* * *

Q. How did you create this document?
A. I got some people to write it for me, and, in turn, this – I got somebody to notarize it for me and sign it.
Q. What, if anything, did you do with this document once it was notarized?
A. I just wanted to try to find a way where I get it to reach my brother in Palestine.
Q. Was that against this court's order?
A. I believe so. Yes sir.

Brother testified that he "got a call from [Husband] . . . through [Sister-in-Law], that [Husband] wanted to execute a power of attorney to sell some of the property, the chalet property, to pay off the loan on [the] Gleason Road [property] . . . for the sake of [his] kids." Brother testified that he encouraged Husband "not to really mess with it and just leave it alone at this time" and to instead "worry about all of the issues that he had . . . the other legal issues that he's going through, . . . the criminal stuff and . . . problems with his wife, and . . . the kids, and a lot more stuff that he really needed to worry about." Brother testified that Husband prevailed on him, so at his brother's request, he contacted the Red Cross in Gaza and the Palestinian consulate, who provided the name of Samir Farhat, an attorney who could help them. Brother testified that he paid Mr. Farhat approximately $3200.00 to travel to Nashville from Florida, "execute the signature" on a power of attorney and a "sworn confession" of Husband, take the documents and "deal with the Palestinian consulate, notarize, you know, the documents and finalize everything to make it legal, and then he would basically mail them to me in Gaza."

Brother also testified that he would not have gotten involved in the situation had he known a divorce was pending between Husband and Wife "because it's not the right thing to do and it's illegal." He testified that from his own personal experience going through divorce, he knew that selling or encumbering marital property during the proceeding of a divorce is prohibited. While testifying, he was shown a statement in his Answer and Counterclaim that he and Sister-in-Law "were aware that [Wife] and [Husband] had filed for divorce back in 2012, but at no time relevant to the facts of this case did they have personal knowledge as to the status of the proceedings of that divorce." He denied that the statement was correct and also testified that he "had never seen [that pleading] ever before this time, never."

Brother denied that he had helped Husband and Wife come to an agreement that settled the order of protection matter, but subsequently contradicted his testimony by

testifying that he served as a mediator between them:

> Q. [Wife]'s never gotten you involved in legal disputes over property?
> A. She is now. She is involved me. She knows the whole story.
> Q. Excuse me?
> A. She really knows more than anybody else that we shouldn't be really here, me and my wife. Because really, our intentions from the beginning up until this point to help her, and help her kids, and help her husband to save the properties. I almost got killed a few times in Gaza trying to save their properties.
> Q. But you never made a single mortgage payment on the house the children and the wife lived in?
> A. Ask me why.
> Q. You never did it?
> A. Ask me why. You need to know why because I had the power of attorney for my brother and suggested to him to do this, and do that, and do this, and do that, and he said, she has a $100,000 worth of gold. If you pay any of that stuff, any of that money to her, I'm not going to be responsible for it. You put yourself in my shoe, what would you do?
> Q. You never made any payments toward the child support obligation?
> A. I never really obligated to. *I was a mediator to try to just make* [*Husband*] *do the right thing.* And she knows, I tried the hardest to really make him do the right thing, put all of the personal conflicts between you and her on the side. You got kids, you need the kids to feel secure in their home. How many times did I tell you that and you, too.

(Emphasis added).

Husband's testimony corroborates Brother and Wife's testimony that Brother served as mediator between Husband and Wife when Wife sought an order of protection from Husband after the complaint for divorce was filed. It also supports a conclusion that Husband directed Brother to not pay "any of that money to [Wife]."

Husband initially testified that Brother was not aware of the divorce proceedings but then changed his testimony to state that Brother was aware of the divorce:

> Q. Did you keep it a secret from [Brother] that [Wife] had filed for divorce against you?
> A. Did I keep it -- No, he knew about it.
> Q. He knew that?
> A. I believe he did. I believe -- yes. I believe he did. I'm not really sure, ma'am. It's been a while, and I was in the state of the mind -- or a state of mind -- I was really drained.

- 21 -

Q. Let me -- let me see if this will help you remember.
A. Sure, ma'am. Yes.
Q. September 26, 2012?
A. September 26, 2012. Okay.
Q. We were right outside this courtroom in the hallway on the order of protection. Do you recall that?
A. Yes, he was on the phone. Yes.
Q. And he was on the phone?
A. Correct.
Q. And what was he doing on the phone with you during that time?
A. He was mediating between me and my ex, yes. Yeah. He was speaking with her and speaking with you, I think. Yes. I spoke with him briefly that day. Yes, ma'am.
Q. He worked out the agreement for you so that you didn't have to have a hearing that day, the order of protection that you agreed to, correct?
A. I believe so, yes. And we went inside the Court and he signed. Yes.
Q. Including that list of expenses that you obligated yourself to pay for?
A. Correct, ma'am.
Q. Okay. So he had to be aware of the divorce, correct?
A. Yes, ma'am.

The above evidence contradicts Brother's testimony that he was unaware of the divorce proceedings between Husband and Wife.

Husband testified that he was aware that, as of the time he was served with the divorce complaint in 2012, he was under an injunction to not dispose of marital property and that he was fully aware of that order when he signed the power of attorney. He also testified that he had the power of attorney created so that his "brother [could] try to sell a portion of that land" in Gaza, though he believed it was against the court's order to send the power of attorney to his brother in Palestine (Gaza).

While Sister-in-Law testified that she did not remember the mutual restraining order entered in her own divorce proceedings in 2009, which provided that each party was "enjoined and restrained from selling, encumbering, trading, contracting to sell, or otherwise disposing [of] . . . any of the property belonging to the parties . . . ," she also testified that she knew that if a divorce is filed, the property is not supposed to be sold until the divorce is decided. She testified that she had no knowledge of the divorce proceedings between Husband and Wife and would not have helped Husband execute the power of attorney, had she known. Sister-in-Law testified that she spoke with Samir Farhat, a Florida attorney and notary, after Husband called and "was begging" her to help him, saying "'Please, please, please, I want to save my kids, my kids, my business, and this is not mine. This is my kids' money. This is my kids' living. Please can you help me? . . . I just want to do a power of attorney.'" She testified that she did not know about Husband and Wife's

divorce though she "kn[e]w they have conflict." She also testified:

> Q. . . . [Y]ou did know that if a divorce was filed that the property is not supposed to be sold? Everything's supposed to be basically frozen until the divorce is decided?
> A. I know that, yeah.
> Q. All right. And that's why you would have told him not to sign the – not to be involved with the power of attorney if you had known about the divorce?
> A. But we didn't know, either me or my husband, we did not know about the divorce.

Sister-in-Law testified that she facilitated three-way calls between Husband and Brother while Husband was incarcerated and Brother was in Gaza. She also testified that after Husband prevailed on her to help him secure a power of attorney, she contacted Samir Farhat and connected them via a three-way call. While they "talk together," she said "sometimes I leave the phone because I have a lot to do inside, so sometimes I listen. Sometimes I don't listen to the conversation." She testified that, given the cost of executing the power of attorney documents in person, which Mr. Farhat insisted upon, she and Brother waited to get Husband's approval, which he gave, and then she facilitated Mr. Farhat's payment by telling her son to write him a check because she "do[es]n't know how to write checks." As to the amount Mr. Farhat was paid, she testified that it was "3200-something. I'm not sure. Maybe 32, 33. I don't know. Maybe 40, 50. I'm not sure about exact number."

Wife testified that she spoke to Brother about the order of protection and about the divorce and that he encouraged her to drop the divorce proceedings. She testified that when Brother visited her in February, March, April, and May after Husband's sentencing in 2016, he kept asking her "why do you need the divorce?"; that Brother asked her what her expectations were about the "Gaza land"; and that he told her she "cannot [have] any of this." Wife testified about the family's financial difficulties, the fact that she did not receive any money from the proceeds of renting or selling the property in Gaza, that she applied for food stamps in order to feed the family and has received those benefits since 2016, and that "in the beginning, [she] g[o]t a lot of financial help from the Muslim community [when she] appl[ied] . . . for help or charity, and they send [her] money every month." She testified that "[t]he community still help me, send me anonymous envelopes that ha[ve] cash or checks." Wife also testified that she asked Brother if she wanted her "to keep begging from the Muslim community to live out of their charity," when Husband had land while she could "barely . . . make the payment on the mortgage."

The record also contains the default judgment against Sister-in-Law, which has not been appealed and operates as an admission of the properly pleaded material allegations of fact contained in the complaint. ***Morgan***, 363 S.W.3d at 495. Further, Brother and Sister-in-Law's answer (filed after the default judgment was entered against Sister-in-Law) states

that "they were aware that [Wife] and [Husband] had filed for divorce back in 2012."

As we consider the above evidence, much of which is contradictory, we are mindful of the trial court's adverse credibility finding with respect to the testimony of Brother, Sister-in-Law, and Husband. With respect to this cause of action, the trial court in this case held:

> The record shows that Brother, despite notice of the January 2017 order, sold one thousand two hundred fifty square meters (1,250 SM) of the Chalet property on June 20, 2017, for the sum of Four Hundred Fifty-one Thousand Five Hundred Dollars ($451,500.00), using the Power of Attorney that was certified by the Palestinian Embassy May 19, 2017. [Husband], Brother, and [Sister-in-Law] jointly conspired to violate this Court's orders, dispose of marital property in such a fashion as to defeat Mother's rightful claim to an equitable division of the marital estate.

Brother and Sister-in-Law do not cite to evidence in the record that preponderates against these findings, and we conclude, based on the evidence we have set forth above, that the record supports the trial court's findings and its ultimate conclusion that Husband, Brother, and Sister-in-Law engaged in a conspiracy to defraud. Husband, Brother, and Sister-in-Law spent hours on the phone while Brother was in Gaza, and they were actively involved in the execution of a power of attorney to permit Brother to sell marital real estate in the Gaza Strip. The execution of that document in furtherance of Husband's goal of preventing Wife from benefiting from parts of the marital estate constitutes conspiracy to defraud, as it was an act that was taken to effectuate a breach of Husband's legal and equitable duty and was injurious to Wife. *Keith*, 780 S.W.2d at 754. While proceeds from the sale were used to attempt to preserve certain parts of the marital estate, such as the property where Husband's business was located, Brother received funds in excess of the amount owed on that property but chose to not pay any of those monies to Wife to assist her in making the mortgage payment or helping with household expenses. Wife was required to reapply several times to refinance the mortgage on the marital home, to sell cars, and to seek public assistance in the form of food stamps as well as charity from the Muslim community in order to provide for her and her children's basic needs. The evidence is clear that Husband, Brother, and Sister-in-Law worked together to accomplish an unlawful purpose of selling parcels of real property that were marital assets and preventing the proceeds from being used to benefit the marital estate, the Wife, or the children.

Brother and Sister-in-Law devote section 5 of the argument section of their brief to their position that they "cannot be held liable for damages for violating the temporary injunction or any restraining order or injunction [against disposing of marital property] entered in this case because they did not receive actual notice of any restraining order or injunction that is specific in terms and described in reasonable detail." Given the proof in

- 24 -

the record that Brother was aware of the pending divorce and his testimony that he knew that disposing of marital property while a divorce is pending is "illegal," we conclude that there is little significance in whether Brother and Sister-in-Law received notice of the mandatory injunction. This is not a case involving contempt of a trial court's order, but imposing liability for a civil conspiracy to defraud a spouse of the marital property to which she was entitled. The evidence simply does not preponderate against the trial court's finding that Brother and Sister-in-Law engaged in this conspiracy knowing that it was improper. As such, this issue is respectfully without merit.[10]

The proof at trial establishes that these three parties procured a power of attorney so as to sell certain marital property, the proceeds of which Husband directed should be withheld from Wife and was not used to pay for the family's living expenses. Based on the foregoing analysis, we conclude that the trial court's imposition of liability (and its exercise of personal jurisdiction via the conspiracy theory of personal jurisdiction) was fully supported by the record. Our conclusion in this regard resolves the second, fourth, and fifth issues raised by Brother and Sister-in-Law on appeal.

## D. Valuation of Marital Property

The trial court valued the marital property in Gaza at $1,380,714.00 upon its finding that "[Wife]'s testimony and the method of valuation she proposed [is] credible and therefore adopts without modification her valuation of the various assets awarded to the parties." Brother and Sister-in-Law challenge the court's valuation of the remaining marital portion of the Gaza Strip property and argue that Wife should have submitted "competent and reliable expert testimony in support and a reliable appraisal, comparable sales data, or other documentary evidence" instead of relying on her own testimony.

Our review of a trial court's valuation was set forth in ***Wallace v. Wallace***:

The value of marital property is a fact question. Thus, a trial court's decision with regard to the value of a marital asset will be given great weight on appeal. In accordance with Tenn. R. App. P. 13(d), the trial court's decisions with regard to the valuation and distribution of marital property will be presumed to be correct unless the evidence preponderates otherwise.

The value of a marital asset is determined by considering all relevant evidence regarding value. The burden is on the parties to produce competent evidence of value, and the parties are bound by the evidence they present.

---

[10] The fifth issue, as phrased in their Statement of the Issues, was "Whether dissipation of marital assets sufficiently constitutes a predicate tort necessary for a plaintiff to sustain a claim for civil conspiracy where no predicate tort and requisite culpable mental state is pled or established by the evidence at trial." We have addressed these concerns in our discussion of the tort of conspiracy to defraud.

> Thus the trial court, in its discretion, is free to place a value on a marital asset that is within the range of the evidence submitted.

733 S.W.2d 102, 107 (Tenn. Ct. App. 1987) (citations omitted). The valuation and distribution of the marital estate rest within the sound discretion of the trial court, and the trial court's decisions in this regard, "especially in matters involving the credibility of witnesses, should not be overturned absent an abuse of that discretion." *Melvin v. Johnson-Melvin*, No. M2004-02106-COA-R3-CV, 2006 WL 1132042, at \*3 (Tenn. Ct. App. Apr. 27, 2006) (citing *Ingram v. Ingram*, 721 S.W.2d 262, 264 (Tenn. Ct. App. 1986)).

The parties do not make it abundantly clear in their briefs or the proof presented at trial how large "the Gaza property" is. The evidence in the record, specifically the testimony of Wife, demonstrates that over the course of three years -- 2004, 2005, and 2006 -- during the marriage, Husband purchased three adjoining pieces of real property in the Sheikh Eglien area of Gaza via a power of attorney he executed in favor of his brother Naser. Wife testified that she saw the property during a visit to Gaza in 2010 and described it as "a big, open land" with "fig tree[s], grapes tree[s]." She also testified that at that time, there was just a "small house" with two bedrooms built on the property, but that Husband had since had a sizeable chalet, with rooms and a swimming pool, constructed on the property; on other parts of the land, an orchard was planted, which someone rented from Husband. Wife, Husband, and Brother discussed the 1250 square-meter tract that was sold by Brother during the pendency of the divorce using a power of attorney executed in his favor by Husband with the assistance of Brother and Sister-in-Law. This parcel contained the large dwelling and is referred to as "the chalet property." Brother also testified that he transferred 590 square meters of Husband's property to himself around the same time "because [Husband] owes me some money." When Husband was asked to explain to the Court the "so called 'chalet property' in Gaza" that he owned, he testified that he still owned "a big portion of it[;] some of it has been sold."[11]

---

[11] Brother and Sister-in-Law designated as an issue only that the trial court erred in assigning a value of $1.380,714.00 to the Gaza Strip property that remained a marital asset. In the body of their brief, however, they also argue that the trial court erred in assigning a value to portions of the Gaza Strip property that were no longer marital assets, due to Brother's use of the Power of Attorney. The trial court found that the 1250 square meters portion of property in Gaza was worth $492,950.00, but was sold by Brother for $451,500.00, and that the approximately 590-square meter tract that Brother transferred to himself was worth $232,672.00. According to Brother and Sister-in-Law, there was no evidence "whatsoever" to support the trial court's valuation of these properties. The record reflects, however, that Wife testified that she calculated the above valuations based on a price of "280 Jordanian dinar per square meter," an amount she arrived at by "call[ing] her relative in Gaza to ask them how much is the average [price] of the square meter at the time," who then "look[ed] at sales and . . . g[a]ve me the information over the phone." On appeal, Brother and Sister-in-Law assert that Wife was not competent to make this valuation. Because the trial court's ruling as to these two pieces of property was not designated as an issue of appeal, however, any argument that the trial court erred in relying on Wife's testimony as to these two pieces of property is waived. *Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002) ("We consider an issue waived where it is argued in the brief but not designated as an issue.").

Husband testified that the property he held in Gaza was "worth millions," specifically, "just a little bit more than $2 million."[12] Wife, in contrast, estimated that the marital property in the Gaza Strip was worth approximately $1.3 million.

Counsel for Brother and Sister-in-Law objected to the above evidence of valuation by Wife on the basis that "she's not an owner."[13] The trial court sustained the objection, and that ruling is not challenged in this appeal.[14] However, the trial court's June 25 order

---

[12] The colloquy was as follows:

Q. . . . Do you agree that the property that you held in Gaza Strip under your name –
A. Right.
Q. -- before your brother sold part of it and transferred saw of it to himself was worth millions of dollars?
A. It is worth millions. Yes.
Q. How many millions?
A. Well, maybe about 2 million.
Q. About 3 million?
A. Two.
Q. 2 million. Okay. And that would be for the three strips that we earlier identified that are adjoining the orchard and the chalet?
A. Maybe a little bit more than 2 million. Hold on. Yeah, maybe, you know, just a little bit more than $2 million. Yes, ma'am.

[13] Although Wife was not a record owner, there is no dispute that the property is marital property to which she is entitled to an interest upon divorce.

[14] Though an owner of property is deemed qualified to opine as to the value of his property by virtue of his ownership, **Brown v. Brown**, 577 S.W.3d 206, 213 (Tenn. Ct. App. 2018), *perm. app. denied* (Tenn. Feb. 20, 2019), Wife asserts that she was qualified by virtue of the fact that she was a part owner of the property by virtue of her marriage, regardless of the fact that she was not a record owner. Even assuming that Wife did not qualify under the owner rule, however, Wife was not automatically disqualified to testify about the value of the property just because she was not the record owner of the property. "A lay witness testifying on value must demonstrate sufficient knowledge to the satisfaction of the trial court and must also state the facts upon which he bases his opinion." **Garner v. Garner**, No. E2019-01420-COA-R3-CV, 2020 WL 4354918, at *8–9 (Tenn. Ct. App. July 29, 2020) (quoting **Johnson v. Johnson**, C.A. No. 862, 1989 WL 105654, at *3 (Tenn. Ct. App. Sept. 13, 1989)). In **Union Ry. Co. v. Hunton**, the Tennessee Supreme Court observed:

"Witnesses who are not strictly experts, as well as expert witnesses, may testify as to the value of property, real or personal, or as to the value of services in a proper case. They must, however, have some knowledge on which to base their opinion. If they have such knowledge, the fact that it is slight will go to the weight of their testimony, rather than to its competency; but if they are not acquainted with, or have no knowledge of, the matter in question, so that their opinion can in no way aid the jury, the court should refuse to permit them to give an opinion which would necessarily be a mere guess or conjecture."

88 S.W. 182, 187 (Tenn. 1905) (quoting 1 *Elliott on Evidence*, § 685). As no objection was raised as to the underlying basis of her opinion of the value of the property, the fact that her opinion was based on the report

recites that it "finds [Wife]'s testimony and the method of valuation she proposed to [be] credible and therefore adopts without modification her valuation of the various assets awarded to the parties." The court assigned a value of $1,380,714.00 to the asset identified as "Gaza Property," which was the value submitted by Wife in Trial Exhibit 4, her affidavit of income and expenses, which also contained a list of marital property and her proposed values. Given these conflicting rulings, the record is not entirely clear as to the trial court's ultimate resolution of the objection to Wife's testimony. *Cf.* **Wilson v. City of Memphis**, No. W2014-01822-COA-R3-CV, 2015 WL 4198769, at *10 (Tenn. Ct. App. July 13, 2015) (citing **Fox v. Fox**, 657 S.W.2d 747, 749 (Tenn. 1983)) ("[B]ecause of the order's interlocutory nature, it was subject to change by the trial court at any time prior to entry of the final judgment."). Regardless, the other evidence in the record as to the value of this property was that of Husband, who testified that the three tracts of land together were worth "just a little bit more than $2 million." Thus, any error in the trial court's valuation based on the testimony offered by Wife is harmless, as the value assigned falls within the realm of the value assigned to the property by Husband.[15] Accordingly, we affirm the court's valuation of the Gaza property.

### E. The Relief Awarded

In their sixth issue raised, Brother and Sister-in-Law assert that the trial court erred by awarding injunctive relief that was not requested by Wife. They argue that Wife "did not ask the trial court to order [Brother] and [Sister] to place for sale the two pieces of property held in Brother's name, or property remaining titled in Husband's name" and that she cannot recover money damages in excess of the amount sought in the complaint. In their seventh issue raised, they argue that the court's $690,357.00 judgment against them in favor of Wife amounted to "an illegal punitive damages award" of which they did not receive notice.

Rule 54 of the Tennessee Rules of Civil Procedure addresses Judgments and Costs. Rule 54.04 provides:

> A judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment. Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings; but

---

of family members living in the area should have gone to the weight to be afforded her testimony by the trial court.

[15] The trial court's calculations hew very closely to Husband's testimony. Specifically, the value of the remaining property set by the trial court ($1,380,714.00), plus the values of the two properties sold and transferred by Brother ($451,500.00 and $232,672.00, respectively) creates a total valuation of the Gaza Strip property at $2,064,886.00, or "little bit more than $2 million."

the court shall not give the successful party relief, though such party may be entitled to it, where the propriety of such relief was not litigated and the opposing party had no opportunity to assert defenses to such relief.

Tenn. R. Civ. P. 54.03. The policy behind this rule was stated in **Holder v. Drake**:

It would be fundamentally unfair to have the complaint lead defendant to believe that only a certain type and dimension of relief was being sought and then, should he attempt to limit the scope and size of the potential judgment against him by not appearing or otherwise defaulting, allow the court to give a different type of relief or a larger damage award. In a similar vein, unless all the parties in interest have appeared and voluntarily litigated an issue not within the pleadings, the court should consider only those issues presented in the pleadings. In sum, then, a default judgment may not extend to matters outside the issues raised by the pleadings or beyond the scope of the relief demanded."

908 S.W.2d 393, 395 (Tenn. 1995) (emphasis removed) (quoting **Qualls v. Qualls**, 589 S.W.2d 906, 910 (Tenn. 1979)).  In **Tennison Bros., Inc. v. Thomas**, this Court observed:

"[A] plaintiff may obtain a default judgment without a hearing on the merits." **Henry v. Goins**, 104 S.W.3d 475, 481 (Tenn. 2003). "[U]pon entry of a proper default judgment, the subsequent proceedings should be confined to the establishment of the amount of damages." **Witter v. Nesbit**, 878 S.W.2d 116, 119 (Tenn. Ct. App. 1993). The entry of a default judgment "establishes the non-defaulting party's right to maintain the action and recover some damages." **Husk v. Thompson**, No. M2016-01481-COA-R3-CV, 2017 WL 3432686, at *4 (Tenn. Ct. App. Aug. 10, 2017) (*no perm. app. filed*) (citing **Sherick v. Jones**, No. 87-351-II, 1988 WL 55028, at *6 (Tenn. Ct. App. June 3, 1988)). Although the trial court may immediately enter final judgment without a determination by proof when the amount of damages is liquidated, the amount of unliquidated damages "remains an open question to be determined by proof." **Id.**

556 S.W.3d 697, 721–22 (Tenn. Ct. App. 2017).  Thus, even with the existence of a default judgment entered against Sister-in-Law, the amount of damages owed to Wife was a matter to be resolved by the trial court.

"'Damages' are the measure of the loss or harm, *generally in the form of pecuniary compensation,* resulting from an injury suffered by a person because of the unlawful act, omission, or negligence of another. It is the word which expresses *in dollars and cents* the injury sustained by a plaintiff." **Newcomb v. Kohler Co.**, 222 S.W.3d 368, 383 (Tenn. Ct. App. 2006) (quoting 25 C.J.S. Damages § 1 (2002)).  Damages "make a plaintiff whole for

harm that the plaintiff has suffered." 25 C.J.S. *Damages* § 2 (2020). Generally, "the *existence* of damages cannot be uncertain, speculative, or remote, but the *amount* of damages may be uncertain if the plaintiff lays a sufficient foundation to allow the trier of fact to make a fair and reasonable assessment of damages." ***Tennison Bros.***, 556 S.W.3d at 724 (citing ***Hannan v. Alltel Publ'g Co.***, 270 S.W.3d 1, 10 (Tenn. 2008) *overruled on other grounds by **Rye v. Women's Care Ctr. of Memphis, MPLLC**, 477 S.W.3d 235 (Tenn. 2015)).

While compensatory damages are intended to compensate the plaintiff for injury, punitive damages are intended to punish the wrongdoer and deter future misconduct. ***Goff v. Elmo Greer & Sons Const. Co.***, 297 S.W.3d 175, 187 (Tenn. 2009) As such, punitive damages are appropriate only when a "defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." ***Hodges v. S.C. Toof & Co.***, 833 S.W.2d 896, 901 (Tenn. 1992) (outlining a variety of considerations that are applicable in the punitive damages context).

With those standards in mind as we consider the sixth issue raised, we conclude that the Amended Complaint, the court's June 25 order, and the record as a whole belie Brother and Sister-in-Law's arguments that the relief awarded was beyond the relief requested by Wife. In the Amended Complaint, Wife specifically pled allegations of the parties' fraudulent conduct and then requested the following relief:

> That all transfers of property from [Husband] and/or [Brother] and/or [Sister-in-Law] be declared null and void and the property be disgorged and restored to the mar[it]al estate and/or that judgment enter against all the Defendants jointly and severally for all funds received that relate to the property and losses associated with their actions or inactions.

Wife also sought her attorney's fees and costs. In her motion for default judgment against Brother and Sister-in-Law, Wife requested a default judgment "in the amount of the cash they received from the illicit sale of a portion of the property in Gaza . . . $450,000.00, and for any and all rents and receipts received from the maintenance and operation of Gaza property after February 22, 2017," the date on which Wife was supposed to have begun receiving all net revenues from Husband's properties, per its March 20, 2017 order.

After trial, at which Brother and Sister-in-Law appeared and litigated the issue of whether or not they committed conspiracy to defraud, the trial court's June 25 order made the following findings and awarded Wife the following judgment:

> 7. . . . The parties agree that on June 22, 2017, a portion of the proceeds from that sale in the amount of One Hundred Eighty-four Thousand Six Hundred Thirteen and 25/100 Dollars ($184,613.25) was sent to the mortgage holder to pay off the shop in the United States. Subtracting from the sales price

the amount applied to the shop's mortgage and the $46,000.00 assigned previously to Father as "dissipated" property because it was unaccounted for in Brother's or Father's testimony concerning the use of the $451,500.00 sales proceeds, leaves a balance from the sales proceeds of $220,886.75. *Mother is hereby awarded a judgment jointly and severally against Father, and the Third-party Defendants (Brother and [Sister-in-Law]) in the amount of $110,443.37 (1/2 of $220,886.75).*

\* \* \*

Using proceeds from the sale of the portion of Chalet property Brother bought other property near the Israeli border in his own name in Gaza, consisting of One Thousand Seventeen (1,017) square meters for Eighty-four Thousand Five Hundred Dollars ($84,500.00) on August 17, 2017. The Court acknowledges that it has not reduced the sales proceeds for this portion of the sales proceed used by Brother before awarding Mother a one-half interest in the balance of the sales proceeds as set forth above. The Court finds that Brother's lawsuit against Father alleging theft, defrauding Brother and/or Adel, payment for management of the Gaza property, compensation for personal injuries sustained by Brother in Gaza, and the expenses allegedly incurred by Brother in Gaza are without merit and not supported by any competent evidence. The claims filed by Brother are hereby dismissed. Brother, Father and [Sister-in-Law] have no credibility given their actions and testimony during this pendency of this case. Brother claims to have "repurchased" some inherited property that Husband resold to Adel with Sixty Thousand Dollars ($60,000.00) from the proceeds of the sale of the portion of the Chalet property even though the proof shows Adel never paid for the property. Exhibit 26. There is likewise no proof Brother actually paid Sixty Thousand Dollars ($60,000.00) to retrieve the property. This amount also was not deducted from the sales proceeds before Mother was awarded a judgment.

\* \* \*

On April 10, 2018, Brother registered Five Hundred Ninety (590) square meters of the Chalet property to himself using the Power of Attorney. This occurred after service using the Secretary of State had been attempted for the second time and several more personal service attempts had been made. The value of the land transferred by Brother to himself is $232,672.00. *Mother is awarded judgment, jointly and severally against Father, Brother, and [Sister-in-Law] for $116,336.00 for her one-half interest in the property transferred to Brother in violation of this Court's orders.*

- 31 -

* * *

10. Father, Brother and [Sister-in-Law] are hereby ordered to place for sale all of the Gaza property remaining titled in Father's name. The parties shall use their best efforts to accomplish a commercially reasonable sale for a fair market price given the values the parties testified to in open court and the Court's valuation found herein. In addition, they are ordered to place for sale the two pieces of property held in Brother's name. From the proceeds of the sale, Mother shall be paid the sum of $690,357.00 (See Exhibit 1 Line 8). From Father's portion of the proceeds, Mother shall be paid an additional $529,475.47 for the judgments awarded to her herein against Father, Brother, and [Sister-in-Law] jointly and severally. The judgment includes $76,500.00 for child support arrearages, $131,472.00 for pendente lite support arrearages, $110,443.37 for one-half of the amount due for the sale of 1,250 square meters of Gaza property, $116,336.00 for one-half of the 590 square meters of property Brother transferred to himself, and $94,724.00 for Wife's pre-trial attorney's fees. In the event that the sale does not suffice to pay the full amount awarded to Mother herein, the funds shall first be applied to Father's outstanding obligations to Mother and then to the joint and several judgements against Father and his coconspirators. Any unpaid amount shall remain a judgment and earn interest at the maximum statutory rate for judgments commencing upon this Order becoming final.

(Emphasis added).

In essence, the court ordered the sale of all property in Gaza that was still owned by Husband and awarded Wife a judgment of $690,357, representing half of the marital equity in the real property remaining in Gaza and giving effect to its 50-50 division of that asset. The judgment of $529,475.47,[16] for which Brother and Sister-in-Law are jointly and severally liable, accounts for the funds to which Wife was entitled during the pendency of the divorce, including child support and support *pendente lite*, as well as the funds received by Brother related to the real estate in Gaza that he and Sister-in-Law were found liable for fraudulently conveying so as to prevent Wife from benefitting from them. This was the relief Wife sought in her amended complaint, and the judgment of $529,475.47, for which Husband, Brother, and Sister-in-Law are jointly and severally liable, serves to make Wife whole for the money she went without during the pendency of this divorce.

Though discussed in their seventh issue raised, Brother and Sister-in-Law also set

---

[16] The amount of the judgment appears to be off by ten cents, likely due to a scrivener's error. Totaling the amounts owed to Wife, as stated in the order and summarized in paragraph 10, results in a total of $529,475.37, not $529,475.47. We do not disturb the amount entered, in light of the minute difference in value compared to the overall amount of the judgment.

forth various amounts of money that they spent during the pendency of the divorce which they contend render the amount of the judgment "contrary to the evidence." Several of these amounts do not appear to relate to the marital estate but to their cross-claims against Husband that were dismissed by the trial court. They do not support these claimed amounts with citation to the record, as required by Rule 27(a)(7)(A) of the Rules of Appellate Procedure. The trial court's order addresses some of the amounts explicitly,[17] and we do not think that their contentions illustrate that the judgment awarded was contrary to the evidence.

We have held earlier in this opinion that the trial court had the authority to order that the Defendants sell the land and have also affirmed the trial court's valuation of the Gaza property. The order states the basis for the amount of the judgment, and Brother and Sister-in-Law do not cite to evidence that preponderates against it. Moreover, both Brother and Sister-in-Law, notwithstanding the default judgment entered against her, actively participated in litigating the claim Wife raised against them and thus had the opportunity to assert their defenses to such relief. We conclude that the judgment entered by the trial court was a proper exercise of its jurisdiction and is supported by the evidence before it.

In Brother and Sister-in-Law's seventh issue raised, they argue that the amount of the $690,357.00 judgment entered against them renders it an "excessive" and "illegal" award of punitive damages.[18] Their argument appears to be premised on a misreading of

_____

[17] For example, in their brief, Brother and Sister-in-Law argue:

[Brother] testified that he paid $60,000.00 to Adel Nabil Abdulnabi to remove a cloud on title to other property wrongfully created by Husband in an unrelated transaction. Husband admitted to this transgression in Exhibits 25 and 26 [a translated declaration of Husband executed in April 2017 in which he admits to assigning a piece of property to another of his brothers and then later selling the same piece of property to an individual named "Adel Nabil Abdelnabi"]. The parties testified to other expenditures made for the benefit of the spousal parties while Nahed was in Gaza and other marital liabilities.

The trial court's order states:

Brother claims to have "repurchased" some inherited property that Husband resold to Adel with Sixty Thousand Dollars ($60,000.00) from the proceeds of the sale of the portion of the Chalet property even though the proof shows Adel never paid for the property. Exhibit 26. There is likewise no proof Brother actually paid Sixty Thousand Dollars ($60,000.00) to retrieve the property. This amount also was not deducted from the sales proceeds before Mother was awarded a judgment.

[18] In their Statement of the Case, Brother and Sister-in-Law assert that the judgment is "unconstitutionally excessive and violates [their] due process rights under the United States Constitution and the Tennessee Constitution." Though they do not elaborate on that position in their Argument section such that we are able to give it consideration, the Tennessee Supreme Court has observed that the U.S. Supreme Court "has held that the Excessive Fines Clause of the Eighth Amendment did not apply to civil

- 33 -

the order, which requires Husband, Brother, and Sister-in-Law to sell all the Gaza property that remains in Husband's name and that Wife shall receive a sum of $690,357.00 from that sale. But the order does not state that they are liable for that amount. The order only states that they are only jointly and severally liable for the additional $529,475.47 judgment. Contrary to their assertions regarding the punitive nature of the judgment, the court's June 25 order simply does not contain an award of punitive damages. The judgment against them is comprised of specific amounts of money to which the record makes clear Wife was entitled, and no findings demonstrate that the trial court intended to award additional damages that would be punitive in nature so as to deter their behavior. We deem this issue to be without merit. Accordingly, we affirm the judgment entered by the trial court.

Having addressed all issues raised by Brother and Sister-in-Law by affirming the trial court's rulings that they challenged, we now turn to the issues raised by Husband.

## F. Failure to Grant a Continuance

"Continuances . . . may always be granted by the court, upon good cause shown, in any stage of the action." Tenn. Code Ann. § 20-7-101. It is within the discretion of the trial court to grant or deny a continuance. *Howell v. Ryerkerk*, 372 S.W.3d 576, 579 (Tenn. Ct. App. 2012). We will not interfere with a court's decision unless it constitutes an abuse of discretion and causes prejudice to the party seeking the continuance. *Id.* "Decisions regarding continuances are fact-specific," and thus "motions for a continuance should be viewed in the context of all the circumstances existing when the motion is filed." *Nagarajan v. Terry*, 151 S.W.3d 166, 172 (Tenn. Ct. App. 2003). Factors relevant to the trial court's decision include: "(1) the length of time the proceeding has been pending, (2) the reason for the continuance, (3) the diligence of the party seeking the continuance, and (4) the prejudice to the requesting party if the continuance is not granted." *Id*. The party seeking a continuance must show that the circumstances justify the continuance. *Osagie v. Peakload Temporary Services*, 91 S.W.3d 326, 329 (Tenn. Ct. App. 2002). In order to meet this burden, the moving party must supply some "strong excuse" for postponing the trial date. *Barber & McMurry, Inc. v. Top-Flite Development Corp. Inc.*, 720 S.W.2d 469, 471 (Tenn. Ct. App.1986) (citing *Levitt & Co. v. Kriger*, 6 Tenn.App. 323 (Tenn. Ct. App. 1927)).

Husband argues that his "due process rights were violated" when the court denied his request for a continuance to allow new counsel time to prepare for trial. Husband did

---

punitive damages awarded between private parties." *Hodges*, 833 S.W.2d at 900 (citing *Browning-Ferris Industries v. Kelco Disposal, Inc.*, 492 U.S. 257, 260 (1989)). Additionally, the Tennessee Supreme Court, citing due process concerns, set forth a list of factors and a review process to ensure that an award of punitive damages is warranted in *Hodges*, 833 S.W.2d at 900–01.

not engage new counsel.[19] He does not cite us to, and our review of the record does not reveal, a motion or even an oral request for a continuance relating to a need for his new counsel to prepare for trial. In fact, the only motion for a continuance of the trial made by or on behalf of Husband was filed on May 8, 2018, in which his counsel asserted that Husband "is uncooperative about his divorce while he has been in custody . . . [with the result that] Counsel has been unable to prepare for or present a trial in this matter" and accordingly requested "that this trial be continued until [Husband] is out of custody and can assist in the preparation for the trial in this matter." At that time, the trial was set for May 21, 2018. The motion to continue was denied by order entered August 7, 2018, on the basis that "this Court made clear that with a proper submission of an Order to Transport, this Court would ensure [Husband]'s availability for trial preparation and trial." However, in the same order, the trial court concluded that a continuance of the trial to February 25–27, 2019 was warranted to allow Brother the opportunity to answer the complaint he had been served with in court during the May 11 hearing at which Husband's prior counsel's motion for a continuance was heard.

In an order entered February 8, 2019, which granted Husband's counsel's motion to withdraw due to Husband's filing of an ineffective assistance of counsel claim in his criminal case, the trial court stated that "[t]his matter continues to be set for trial on February 25-27, 2019, and March 4, 2019. The relieving of Mr. Jolley as counsel will not continue this trial date. [Husband] shall obtain new counsel or represent himself." Though Husband contends that this statement constitutes "the trial court's denial of a continuance to allow him to obtain new counsel," the record contains no such request for a continuance.

Nevertheless, Husband asserted in his motion for a new trial that "this Court's denial of [his] request for a continuance to allow him sufficient time in which to locate counsel to represent him in this cause was an abuse of discretion by the Court." By order entered August 29, 2019, the trial court denied Husband's motion for a new trial; pertinent to this purported denial of a continuance, it held:

---

[19] The record does not support Husband's assertion that he retained new counsel. To the contrary, the transcript of the trial reflects that on February 26, an attorney named Mr. Tindell stated on the record that he "will not be appearing for Mr. Abdelnabi in this case." When Mr. Abdelnabi was brought into the courtroom, the following colloquy took place:

> MR. ABDELNABI: Before I start, Your Honor, I thought -- I had a meeting with the counselor this morning, and came and saw me.
> MS. SOBIESKI: Your Honor, I'm having trouble hearing.
> MR. ABDELNABI: I had a counselor this morning, came and saw me --
> JUDGE MCMILLAN: Mr. Tindell has declined to become affiliated with the case. He will not be making an appearance on your behalf.
> MR. ABDELNABI: Yes, sir. I need just to get my thoughts together for a second.

Husband then began his cross-examination of his daughter, Nesma.

1. Defendant chose several years ago to utilize the same attorney to represent him in his criminal case as well as the divorce case. [Defendant] was convicted and waited nearly an entire year before asserting a claim of ineffective counsel against his counsel. During the time that Defendant was considering to assert a claim of ineffective counsel and while that claim was being prepared, he had time to retain new divorce counsel. The Defendant is an educated and skilled businessman. The Court has absolutely no doubt that he understood that asserting an ineffective assistance claim against his original counsel would require that attorney to withdraw from both matters. Defendant delayed this case while the criminal matters were pending. During that delay and subsequent periods once the case proceeded, Defendant disposed of assets and conspired with his family to defeat Plaintiffs claim to substantial marital property. Defendant failed to obtain new divorce counsel at the time he retained his new post-conviction counsel. He is not entitled to a new trial due to not having counsel under these circumstances.

On appeal, Husband takes issue with the above statements made by the court, arguing that "he did not contemplate that his post-conviction claims would conflict his counsel, requiring his counsel to withdraw from this divorce case." Regardless of what Husband contemplated, the record is devoid of any indication that the trial court was presented with an opportunity to grant or deny his motion for a continuance. Given the length of time the proceeding has been pending, the fact that trial had already been continued once, the fact that Husband was aware of the consequences of not retaining counsel (i.e., that he would represent himself), the fact that Husband was not guaranteed the assistance of counsel in this civil proceeding, and the lack of any attestations to the court of Husband's diligence in attempting to locate new counsel, we discern no abuse of discretion in the trial court's decision to proceed with trial despite the withdrawal of Husband's counsel, especially when no motion or request for a continuance was actually made. Moreover, Husband was present for each day of the trial, afforded the opportunity to be heard when he spoke in court, and cross-examined the witnesses; we discern no prejudice resulting from the court's decision to adhere to the trial schedule it had previously set. Accordingly, we deem Husband's contentions in this regard to be without merit.

## G. The Award of Child Support

Husband challenges the amount of monthly child support ordered by the court as well as a judgment for $76,500 entered against him for retroactive child support.

In the June 25 Order, the trial court stated the following with respect to the amount of Husband's child support:

On September 8, 2012, a parenting plan was entered that provided Father's child support for 4 children would be $2,000.00 per month. That order has never been modified. Father's willful and intentional actions that resulted in his conviction and incarceration do not relieve him of his existing child support obligation. The Court, in absence of evidence to the contrary, will reduce the child support pro-rata for the three older children as they reached the age of majority. . . Child support shall continue at the rate of $1,000.00 per month through at least December 2026 and perhaps through May 2027 depending on Omar's date of graduation from high school. Without being reduced to present value, the amount of child support owed by Father between July 1, 2019 and December 2026 is $90,000.00. Mother shall have a lien upon any assets awarded to Father to secure that amount of child support. Upon Father's child support obligation for Omar terminating by operation of law as indicated above, child support for Hamza shall continue at the rate of $500.00 per month. Mother's attorney is directed to prepare and submit a Parenting Plan containing the provisions of her proposed plan and the Court's ruling concerning child support set forth herein.

In denying Husband's motion for a new trial, the trial court's order stated:

4. The Court took into account Defendant's earning ability prior to incarceration and his lifestyle prior to incarceration to determine that the amount of child support suggested was appropriate based on Defendant's testimony about the assets he was able to acquire (home, rental condominiums, real estate in Gaza worth at least One Million Dollars, and vehicles for his daughters and family to drive). Other than an unsupported allegation that the Court erred, Plaintiff has shown no basis for a new trial.

The parenting plan entered by the trial court on October 10, 2019, sets Husband's monthly support obligation at $1000 per month and provides, "This amount shall change to $500.00 [per month] when Omar ages out or graduates from high school, whichever is last. $500.00 [per month in] child support shall continue indefinitely because of Hamza's special needs. This will be needed for Hamza's lifetime, and shall be modifiable."

Setting the amount of child support is a discretionary matter and is reviewed using the deferential "abuse of discretion" standard. *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000).

With respect to the amount of the monthly child support obligation, Husband argues that Wife has presented no evidence of either party's earning capacity, and thus the court should have imputed annual gross income at an amount of $37,589 per year for male parents and $29,300 for female parents, as set forth in the relevant Child Support

Guidelines, which he argues would have reduced his support obligation to $784.00 per month.[20]

His arguments are unavailing. First, Wife did offer testimony as to her income. She testified that she works as a telephone interpreter "from English to Arabic and Arabic to English," for which she is paid 45 cents per minute, and that her average income is $864 per month. The permanent parenting plan set Wife's gross monthly income at $864.00, which is supported by the evidence. The evidence therefore does not support imputing to Wife an annual income of $29,300.00, or $2,441.67 per month, which would be well above the $864 per month that Wife testified she actually earns.

The plan also set Husband's gross monthly income at $3,336.00, which amounts to $40,032 in annual income, which equates to approximately $204 more in income per month than would be attributed to him using the $37,589 annual amount he prefers. Ultimately, the child support worksheet set Husband's monthly child support obligation at $999, which effectuates the court's directive that he pay $1,000.00 per month in support for the parties' two children who were still under the age of majority.

We agree that had the trial court imputed income to Husband in the amount of $37,589.00, Husband's child support obligation would be reduced by a small amount. We cannot agree, however, that the trial court abused its discretion in refusing to use this figure. As an initial matter, the trial court's written findings of fact and conclusions of law correctly note that imputation of income for a voluntarily unemployed parent may be based on, *inter alia*, "[t]he parent's past and present employment[.]" Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(I); *see also* **Willis v. Willis**, 62 S.W.3d 735, 739 (Tenn. Ct. App. 2001) ("Where an obligor parent is found to be willfully and voluntarily underemployed, his child support obligation is based upon his "potential income, as evidenced by educational level and/or previous work experience" rather than his actual income."). While the Child Support Guidelines do contain a figure for the imputation of income, this figure is not determinative when other evidence is submitted to show the parent's income or income potential. *Cf.* **In re Samuel P.**, No. W2016-01665-COA-R3-JV, 2018 WL 1046784, at *13 (Tenn. Ct. App. Feb. 23, 2018) (holding, in the context of a self-employed parent, rather than an unemployed one, that "a trial court may not impute the median gross income when reliable evidence of a parent's income or income potential has been presented. Rather, the median income amount is only available in the event reliable evidence of a parent's income or income potential is not presented.") (internal quotation marks and citations omitted).

Here, the trial court's written findings reflect that Husband was able to amass

[20] Husband does not argue either that the imposition of child support for Hamza's lifetime was inappropriate or that the trial court erred in awarding Wife a lien on Husband's assets to secure the payment of future child support. As such, we do not address the propriety of either of these rulings.

considerable property prior to his incarceration. Moreover, the trial court's order specifically noted that Husband initially agreed to pay $2,000.00 per month in temporary child support for four children. While this agreement may not be binding as to future child support, it is certainly evidence that even Husband believed that he had the ability to pay such an amount. Thus, it appears that rather than using the figure provided by the Child Support Guidelines, the trial court looked to Husband's past ability to earn income to indicate that he would be imputed income sufficient to pay half of his previously agreed to amount, in reflection of two of the parties' four children reaching the age of majority.

Importantly, trial courts generally have "considerable discretion" in the realm of determining income following a finding of voluntary unemployment. *Holdsworth v. Holdsworth*, No. W2013-01948-COA-R3-CV, 2015 WL 3488929, at *20 (Tenn. Ct. App. June 3, 2015); *see also* **Eldridge v. Eldridge**, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002) ("Whether an obligor is willfully and voluntarily underemployed is a question of fact, and the trial court has considerable discretion in its determination."). The discretionary nature of this decision "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" **Henderson v. SAIA, Inc.**, 318 S.W.3d 328, 335 (Tenn. 2010) (quoting **Lee Medical, Inc. v. Beecher**, 312 S.W.3d 515, 524 (Tenn. 2010)). Here, the trial court chose to set Husband's monthly income at $3,336.00, a mere $204.00 more than what Husband asserts that he should be found to earn. Utilization of Husband's proposed figure appears to result in a less than $50.00 per month reduction in child support.[21] We note, however, that it was Husband's own criminal conduct that lead to the situation wherein the trial court was required to determine Husband's income for child support purposes. The record reflects that Husband was not a low-income earner prior to his criminal conduct. And he voluntarily agreed to pay a considerable amount of child support during that time, only half of which he is now required to pay. To allow Husband to benefit from what he now deems was a lack of reliable proof as to his pre-incarceration income in this particular situation would be to essentially reward Husband for his criminality. Under these circumstances, we cannot conclude that the trial court's decision to impute income to Husband so as to obligate him to pay $1,000.00 per month in child support was an unreasonable choice under the circumstances. We therefore discern no abuse of discretion in the trial court's imputing income to Husband or in imposing the support obligation it did.

With respect to the retroactive child support award of $76,500.00, Husband contends that his child support obligation should have been reduced to account for the time period from 2012 when the complaint was filed but the parties were still living together up to and including the date of his incarceration in 2016, which he argues "is obviously not credited to the Defendant."

---

[21] This calculation utilizes the figure for Wife's income that we have previously held was correct.

His argument in this regard overlooks Wife's testimony that she was seeking $72,000.00 in child support arrearages, but was not seeking child support from the time in 2012 when they reconciled and he returned to the marital home until he "went to jail" in February 2016. It also ignores portions of the court's June 25 order in which it stated:

> On September 8, 2012, a parenting plan was entered that provided Father's child support for 4 children would be $2,000.00 per month. That order has never been modified. Father's willful and intentional actions that resulted in his conviction and incarceration do not relieve him of his existing child support obligation. The Court, in absence of evidence to the contrary, will reduce the child support pro-rata for the three older children as they reached the age of majority. *As noted by Mother, she seeks an award for the arrearages accrued after February 2016* and ongoing child support. By February 2016, Father's child support obligation had ended [for Sherin, who turned 18 in March 2015]. He therefore owed $1,500.00 per month through the end of June 2018 [when Nesma turned 18]. There is an arrearage accrued from February 2016 to the date that Father's child support obligation for Nesma ended of $43,500.00 (29 x $1,500.00). For the period of July 2016 through the date of this Order, an additional thirty-six months of support at the rate of $1,000.00 per month has accrued for an additional obligation of $36,000.00. The total child support arrearage is $79,500.00. The parties agreed that Father had paid a total of $3,000.00 during the pendency of the action. Mother is awarded a judgment against Father in the amount $76,500.00 after the credit is applied. Child support shall continue at the rate of $1,000.00 per month through at least December 2026 and perhaps through May 2027 depending on Omar's date of graduation from high school. Without being reduced to present value, the amount of child support owed by Father between July 1, 2019 and December 2026 is $90,000.00. Mother shall have a lien upon any assets awarded to Father to secure that amount of child support. Upon Father's child support obligation for Omar terminating by operation of law as indicated above, child support for Hamza shall continue at the rate of $500.00 per month. Mother's attorney is directed to prepare and submit a Parenting Plan containing the provisions of her proposed plan and the Court's ruling concerning child support set forth herein.

(Emphasis added). The court's calculation of the amount of retroactive support owed by Husband started with what he would have owed in February 2016, when only three of the parties four children were still minors.

The parenting plan that was ultimately entered recited that Wife was awarded a judgment in the amount of $76,500.00 "representing retroactive support" and granted Wife "a lien on all [Husband]'s property wheresoever located and all assets awarded in the

divorce or otherwise acquired for child support from July 1, 2019 through December 31, 2026, in the amount of $90,000."

In light of the above, we deem Husband's argument to be without merit, as Wife's testimony and the court's order directly contradict his assertion that the child support obligation was still imposed on him from the time in 2012 when the parties resumed living together up to the date of his incarceration. We affirm the amount of the trial court's monthly child support obligation as well as the $76,500 judgment as being supported by the record in this case.

## H. The Award of Alimony

Husband also asserts in the issues presented section of his brief that the trial court ordered an excessive amount of alimony. The trial court did find that Husband has no current income due to his incarceration, but ordered a small amount of alimony in futuro in the amount of $100.00 per month. "To avoid depriving a spouse of the right to obtain spousal support in the future if there is a need for it, many courts have approved the practice of awarding a nominal amount of alimony in the final decree in order to retain jurisdiction to alter the amount later if the circumstances warrant it." *Justice v. Justice*, No. M1998-00916-COA-R3-CV, 2001 WL 177060, at *5 (Tenn. Ct. App. Feb. 23, 2001). Amounts characterized as "nominal" range from $1.00 per month obligations up to one case that involved a $500.00 per month obligation. *See, e.g., Stagner v. Stagner*, No. W2009-01749-COA-R3-CV, 2010 WL 3717030, at *7 (Tenn. Ct. App. Sept. 23, 2010) (involving $1.00 per month); *Hunsinger v. Hunsinger*, No. M2008-02434-COA-R3-CV, 2009 WL 4931345, at *6 (Tenn. Ct. App. Dec. 21, 2009) (involving $1.00 per month); *Eaves v. Eaves*, No. E2006-02185-COA-R3-CV, 2007 WL 4224715, at *4 (Tenn. Ct. App. Nov. 30, 2007) (involving $10.00 per month); *Hicks v. Hicks*, No. 01-A-019104CH00126, 1991 WL 200892, at *5 (Tenn. Ct. App. Oct. 9, 1991) (characterizing $500.00 per month as a "nominal amount"). Although Husband asserts that the amount awarded was excessive, Husband fails to devote any argument whatsoever to this position in the argument section of his brief. We thus deem this issue waived. *Bean*, 40 S.W.3d at 56; *Childress*, 97 S.W.3d at 578.

## I. The Permanent Parenting Plan

Husband takes issue with several provisions within the parenting plan. The process for crafting an initial parenting plan was explained in *Armbrister v. Armbrister*:

> [E]very final decree in a divorce action in Tennessee involving a minor child must incorporate a permanent parenting plan. [Tenn. Code Ann.] § 36-6-404(a). A "'[p]ermanent parenting plan' means a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a residential schedule, as well as an

award of child support consistent with chapter 5 of this title." *Id.* § 36-6-402(3).

Fashioning permanent parenting plans is one of the most important responsibilities courts have. *See Massey-Holt*, 255 S.W.3d [603] at 607 [(Tenn. Ct. App. 2007)]; *Boyer v. Heimermann*, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007). Courts performing this task must ensure that permanent parenting plans:

(1) Provide for the child's changing needs as the child grows and matures, in a way that minimizes the need for further modifications to the permanent parenting plan;

(2) Establish the authority and responsibilities of each parent with respect to the child, consistent with the criteria in this part;

(3) Minimize the child's exposure to harmful parental conflict;

....

(5) Allocate decision-making authority to one (1) or both parties regarding the child's education, health care, extracurricular activities, and religious upbringing. . . .

(6) Provide that each parent may make the day-to-day decisions regarding the care of the child while the child is residing with that parent; [and]

(7) Provide that when mutual decision making is designated but cannot be achieved, the parties shall make a good-faith effort to resolve the issue through the appropriate dispute resolution process....

Tenn. Code Ann. § 36-6-404(a)(1)–(9) (2010).

A residential schedule generally must be "consistent with the child's developmental level and the family's social and economic circumstances," and should "encourage each parent to maintain a loving, stable, and nurturing relationship with the child." *Id.* § 36-6-404(b).

Before forging a residential schedule, a court must first determine whether either parent has engaged in any of the misconduct specified in Tennessee Code Annotated section 36-6-406 (2010),[22] which necessitates limiting the parent's residential time with the child. *Id.* § 36-6-404(b). If section 36-6-406 does not apply, then a court crafting a residential schedule must consider fifteen specifically enumerated factors, as well as any other factors deemed relevant by the court, in order to determine how much

---

[22] Footnote twelve in *Armbrister* read: "None of the factors listed in this statute are at issue in this case." *Armbrister*, 414 S.W.3d at 696 n.12. As discussed *infra*, that is not the case in the present matter.

time a child should spend with each parent.

Significant overlap exists between the factors a court must consider when establishing a residential schedule and the factors a court must consider when determining a child's best interests in the course of making an initial custody decision. *Compare* Tenn. Code Ann. § 36-6-404(b), *with* Tenn. Code Ann. § 36-6-106(a); *see also* **Burden v. Burden**, 250 S.W.3d 899, 908 n. 5 (Tenn. Ct. App. 2007) (recognizing that the statutory criteria relevant to the residential schedule overlap with, and somewhat expand upon, the factors set out in section 36-6-106 relevant to determining custody); **Dobbs v. Dobbs**, No. M2011-01523-COA-R3-CV, 2012 WL 3201938, at *1 n. 1 (Tenn. Ct. App. Aug. 7, 2012) ("There is little substantive difference between the factors applicable to parenting plans, set out in Tenn. Code Ann. § 36-6-404(b), and those applicable to custody determinations, set out in Tenn. Code Ann. § 36-6-106(a) as far as determining comparative fitness and the best interests of the child.").

414 S.W.3d 685, 696–97 (Tenn. 2013) (one footnote omitted).

Although the section 36-6-406 limitations of a residential schedule were not at issue in **Armbrister**, they are at issue in this case. The statute's list of factors as they existed when this case was filed are as follows:

(a) The permanent parenting plan and the mechanism for approval of the permanent parenting plan shall not utilize dispute resolution, and a parent's residential time as provided in the permanent parenting plan or temporary parenting plan shall be limited if it is determined by the court, based upon a prior order or other reliable evidence, that a parent has engaged in any of the following conduct:
(1) Willful abandonment that continues for an extended period of time or substantial refusal to perform parenting responsibilities; or
(2) Physical or sexual abuse or a pattern of emotional abuse of the parent, child or of another person living with that child as defined in § 36-3-601.

* * *

(d) A parent's involvement or conduct may have an adverse effect on the child's best interest, and the court may preclude or limit any provisions of a parenting plan, if any of the following limiting factors are found to exist after a hearing:
(1) A parent's neglect or substantial nonperformance of parenting responsibilities;
(2) An emotional or physical impairment that interferes with the parent's performance of parenting responsibilities as defined in § 36-6-402;

- 43 -

(3) An impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting responsibilities;
(4) The absence or substantial impairment of emotional ties between the parent and the child;
(5) The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development;
(6) A parent has withheld from the other parent access to the child for a protracted period without good cause;
(7) A parent's criminal convictions as they relate to such parent's ability to parent or to the welfare of the child; or
 (8) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

Tenn. Code Ann. § 36-6-406(a), (d).  In its June 25 order, the court considered both the best interest factors found at section 36-6-106, as well as the above factors.

"The details of permanent parenting plans are typically left to the discretion of trial courts"; thus, we review the trial court's order to ensure that it "is made with 'due regard for controlling law and based on the facts proven in the case.'" *Maupin v. Maupin*, 420 S.W.3d 761, 770 (Tenn. Ct. App. 2013) (quoting *K.B.J. v. T.J.*, 359 S.W.3d 608, 616 (Tenn. Ct. App. 2011)). "Where the trial court makes specific findings of fact, we presume those findings to be correct unless the evidence preponderates against them." *Id.* (citing Tenn. R. App. P. 13(d); *K.B.J.*, 359 S.W.3d at 613). "If the trial court does not make specific factual findings, there is no presumption accorded to the absent findings; we must conduct our own review of the record to determine the controlling facts by a preponderance of the evidence." *Id.* (citing *Curtis v. Hill*, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006)).

The trial court's June 25 order provides in pertinent part:

5. . . . The girls are now clearly estranged from Father due the actions that led to his conviction, his past treatment of Mother, his failure to provide financial support for the family since his incarceration, and most recently his actions regarding the property located in Gaza. . . . Father stands convicted of having kidnapped and battering one of his acquaintances. Father's sole purpose for the kidnapping and battery was to extract a confession from the individual that he was inappropriately involved with Mother. The Court finds that there is no evidence that Mother was anything but a faithful, loving, and supportive wife to Husband. The Court has made previous findings that Husband committed violent acts against Mother and awarded her a divorce.

Father has physically injured Mother, engaged in emotional abuse by damaging the home in fits of anger. He has broken pieces of furniture. Father installed a tracker on Mother's car and placed cameras in the home and in

the parties' bedroom to monitor her activities. Father began threatening to divorce Mother in 2013, including taking her to Egypt and leaving her with her family with no assets.

In ruling on Husband's motion for a new trial and his objection to Wife's proposed parenting plan, the trial court held:

> 5. The Court's Order required Plaintiff to submit a Parenting Plan that incorporated the Court's ruling. The Court specifically adopted certain of Plaintiff's proposals and did not accept others. Defendant did not submit a proposed parenting plan before trial. At trial, Defendant was afforded the opportunity to cross examine Plaintiff about her proposed parenting plan. The Court considered the testimony and has ruled. The Court has treated Defendant's objection as a motion to alter or amend (or alternatively a new trial). Defendant objects to provisions that the Court finds are necessary for the protection of the parties' minor children and that are consistent with their best interests. Defendant's request is denied.

On appeal, Husband first argues that he objected to the provision labeled paragraph J, within Section I, "Residential Parenting Schedule," which reads:

> There shall be no physical contact with the children due to [Husband]'s convictions for violent felonies and seventeen (17) year sentence, no visits at prison, no Facetime or its equivalent. [Husband] is hereby restrained and enjoined from giving personal information about his children to other prisoners and/or encouraging other inmates to contact the children now or upon release.

His skeletal argument opposing this provision is that he "believes that he should be granted all the rights accorded him pursuant to Tennessee Code Annotated §§ 36-6-110 and 36-6-101(a)(3)." Husband raised the same argument in an Objection to [Wife's] Proposed Parenting Plan, which he filed on August 12, 2019. Wife responded, asserting that, "As to the parent's Bill of Rights, Defendant has waived the right to rely on any of those by his behavior, his neglect, his financial abandonment and his violence." As we have set forth above, the trial court, in ruling on Husband's motion for a new trial, held in pertinent part:

> 5. . . . Defendant objects to provisions that the Court finds are necessary for the protection of the parties' minor children and that are consistent with their best interests.

As we consider the provision at issue, we are mindful that Tennessee Code Annotated section 36-6-110 provides, "Except when the juvenile court or other appropriate

court finds it not in the best interests of the affected child, upon petition by a noncustodial, biological parent whose parental rights have not been terminated, the court shall grant the rights set forth in § 36-6-101(a)(3)(A)." Section 36-6-101(a)(3)(A) similarly provides that *"[e]xcept when the court finds it not to be in the best interests of the affected child*, each order pertaining to the custody or possession of a child arising from an action for absolute divorce . . . shall grant to each parent the rights listed in subdivisions (a)(3)(B)(i)-(vi) during periods when the child is not in that parent's possession or shall incorporate such rights by reference to a prior order." (Emphasis added). The list set forth at section 36-6-101(a)(3)(B) includes a list of nine rights – such as the right to unimpeded telephone conversations, the right to receive notice and relevant information of any hospitalization, major illness or injury, or death of the child, and the right to be given at least 48 hours' notice of extracurricular school, athletic, or church activities – all of which have been struck through in the parenting plan entered by the trial court in this case. The trial court concluded that the provisions limiting contact "are necessary for the protection of the parties' minor children and . . . consistent with their best interests." In light of the evidence in the record of Husband's abusive behavior and lack of concern for the financial, emotional, and physical safety of the children and Wife,[23] we discern no abuse of discretion in the court's decision to include the language in section I. J. of the parenting plan, ordering that Husband shall have no physical contact or video calls or to give out his children's contact information.

Next, Husband argues:

> [Husband] objected to the provision in the Section designated as "III" in its entirety as being in direct contravention to the prenuptial agreement entered into freely, knowledgeably, and in good faith and without exertion of duress or undue influence in and between the Plaintiff and the Defendant.

Section III of the parenting plan is titled "Financial Support" and contains, among other things, the child support obligation that is discussed in section G, *supra*. Curiously, Husband did not address the alleged prenuptial agreement in his arguments on appeal surrounding his child support obligation. His vague reference to a prenuptial agreement is

---

[23] The parties' daughter, Nesma, who is the second oldest of their children, testified about a letter she received from one of her father's fellow inmates that made her "very scared." She testified that she found the letter "distressing" and explained that "it made me feel unsafe because I don't know who now has my home address and who is in there and what they will do or whatever. It was just terrifying to know that someone I don't know in that situation has my address." In the letter, the inmate had told her she had better write him back or he was "going to get [her]." The parties' oldest daughter, Sherin, also testified that she received two letters from her father's fellow inmates, which made her feel "terrified" to have "strangers who know my address." She testified that she contacted the warden to "make sure that did not happen again." Even though Nesma and Sherin are not included in the parenting plan given their age, their testimony demonstrates the need for the trial court to set forth very strict parameters for Husband's communication with his children.

unsupported by citation to a location in the record where such an agreement was entered into evidence, an offer of proof was made, or even a reference to its existence was made.[24] Our review of the record likewise reveals no evidence of the existence of a prenuptial agreement, only Husband's bald assertion, in his motion for a new trial and his objection to the proposed parenting plan, that one existed between the parties in this case and that the child support and alimony obligations imposed by the court conflicted with it. Unsupported statements such as his do not comply with Rule 27(a)(7)(A) of the Rules of Appellate Procedure. To the extent Husband attempts to attack the child support obligation or the remaining portions of Section III (dealing with income tax exemptions, health and dental insurance, or life insurance) by a one-sentence argument that it contravenes a prenuptial agreement, the existence of which is not supported by the record, we deem his contentions to be meritless.

Finally, Husband argues:

> [Husband] objects to the provisions in the Section designated as "VI" wherein the Plaintiff has stricken all of the rights of parents under Tenn. Code Ann. § 36-6-101, purportedly "in light of Father's history of violent felonies, . . ." and, in the alternative, would propose that the Father shall be granted all the rights accorded him pursuant to Tennessee Code Annotated §§ 36-6-110 and 36-6-101(a)(3)(A).

Husband's argument, quoted in its totality above, implicates the same analysis we employed in addressing his first argument regarding the parenting plan. The court concluded that the provisions limiting contact "are necessary for the protection of the parties' minor children and . . . consistent with their best interests," and, in light of the evidence in the record of Husband's abusive behavior and lack of concern for the financial, emotional, and physical safety of the children and Wife, we discern no abuse of discretion in the court's decision to not grant Husband the rights set forth in Section 36-6-101(a)(3)(B).

---

[24] The trial court, in its order denying Husband's motion to alter or amend, stated:

> 2. The Court cannot recall Defendant offering into evidence the prenuptial agreement and the existence of one was not raised in his pleadings prior to trial. Defendant voluntarily agreed to a spousal support and child support award as part of the Order of Protection matter. He waived this issue by failure to plead it or to assert it prior to agreeing to pay alimony and child support. To the extent that any such prenuptial agreement waived child support it would be void as a matter of public policy. Having heard the facts and circumstances under which the family lived when Defendant was not supporting the family and was reliant solely on Plaintiff to provide support for the family, the Court finds that the waiver of alimony would have violated public policy as it would have left Wife a ward of the State.

## J. Frivolous Appeal

In her appellate brief's conclusion section, Wife contends that Husband's appeal is frivolous and thus seeks an award of attorney's fees, interest, and costs for defending against it. Tennessee's frivolous appeals statute provides:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Tenn. Code Ann. § 27-1-122. If the appellate court determines that an appeal is frivolous, the appellate court may award attorney's fees pursuant to this statute, a decision that "rests solely in the discretion of th[e appellate] Court." *Chiozza v. Chiozza*, 315 S.W.3d 482, 493 (Tenn. Ct. App. 2009); *see also Eberbach v. Eberbach*, 535 S.W.3d 467, 475 (Tenn. 2017). We note, however, that Wife did not raise this as an issue in her statement of the issues. As our Supreme Court has explained:

> Appellate review is generally limited to the issues that have been presented for review. Tenn. R. App. P. 13(b); *State v. Bledsoe,* 226 S.W.3d 349, 353 (Tenn. 2007). Accordingly, the Advisory Commission on the Rules of Practice and Procedure has emphasized that briefs should "be oriented toward a statement of the issues presented in a case and the arguments in support thereof." Tenn. R. App. P. 27, advisory comm'n cmt.

*Hodge,* 382 S.W.3d at 334. Because Wife did not raise the issue of this being a frivolous appeal or the fact that she sought her attorney's fees on appeal in her statement of the issues, we decline to award attorney's fees in this appeal.

## CONCLUSION

In light of the foregoing, we affirm the judgment of the trial court in all respects. Costs are taxed equally between the appellants, Nehad Abdelnabi, Nahed Abdulnabi, and Rewa Gharbawe.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE